MILWAUKEE COUNTY PAVERS AS-SOC., a Wisconsin corporation, B.R. Amon & Sons, Inc., a Wisconsin corporation, Barricade Flasher Service, Inc., a Wisconsin corporation, Rodie Beaudoin & Sons, Inc., a Wisconsin corporation, Boulanger Const. Co., Inc., a Wisconsin corporation, Brinkmann Engineering, Inc., a Wisconsin corporation, James Cape & Sons Co., a Wisconsin corporation, Century Fence, a Wisconsin corporation, Earth, Inc., a Wisconsin corporation, Hanz Contractors, Inc., a Wisconsin corporation, Johnson Sand & Gravel, Inc., a Wisconsin corporation, Tom Kuehne Landscape Contractor, Inc., a Wisconsin corporation, La Londe Contractors, Inc., a Wisconsin corporation, Milwaukee General Construction Co., Inc., a Wisconsin corporation, A.W. Oakes, a Wisconsin corporation, Pac–Sac Construction, a Wisconsin corporation, Paving Mix & Construction Co., Inc., a Wisconsin corporation, Pheifer Bros. Const. Co., Inc., a Wisconsin corporation, Reliance Construction Co., Inc., a Wisconsin corporation, Rock Road of Wisconsin, Inc., a Wisconsin corporation, Stoehr Grading Co., Inc., a Wisconsin corporation, Super Excavators, Inc., a Wisconsin corporation, Trierweiler Const. & Supply Co., Inc., a Wisconsin corporation, Vinton Construction Co., a Wisconsin corporation, Zignego Company, a Wisconsin corporation, Plaintiffs,

v.

Ronald R. FIEDLER, individually and in his capacity as Secretary of the Wisconsin Department of Transportation, and David Manning, individually and in his capacity as Wisconsin Department of Transportation Minority Business Programs Director, Defendants.

No. 89–C–177–C.

United States District Court, W.D. Wisconsin.

March 6, 1990.

Joseph W. Melli, John R. Sweeney, Philip J. Bradbury, Melli, Walker, Pease & Ruhly, Madison, Wis., for plaintiffs.

David C. Rice, Office of the Atty. Gen., Madison, Wis., for defendants.

Brady C. Williamson, Linda M. Clifford, La Follette & Sinykin, Madison, Wis., for amici curiae, Wis Minority Contractors Assoc., Lakeside Pavers, Inc., Platt Constr., Bowles Contracting, Inc., Mews Co's, Inc., Underground Pipeline, Inc.

## ORDER

CRABB, Chief Judge.

Plaintiffs, construction companies in Wisconsin, brought this action challenging the constitutionality of the Wisconsin Department of Transportation's Disadvantaged Business Development and Training Program, Wis.Stat. § 84.076. In an order entered February 27, 1989, I granted plaintiffs' motion for a preliminary injunction enjoining defendants' implementation of Wis.Stat. § 84.076. *Milwaukee County Pavers Ass'n v. Fiedler (Milwaukee County Pavers I)*, 707 F.Supp. 1016 (W.D.Wis. 1989). On April 7, 1989, the February order was modified to dissolve the preliminary injunction insofar as it enjoined contracts that were primarily federally funded. *Milwaukee County Pavers v. Fiedler (Milwaukee County Pavers II)*, 710 F.Supp. 1532 (W.D.Wis.1989).

On June 16, 1989, plaintiffs filed an amended complaint. In Count I, plaintiffs repeat the contention that the disadvantaged business set-aside program in Wis. Stat. § 84.076 violates the equal protection clause of the Constitution by creating classifications based on race, sex and national origin. In Count II, plaintiffs contend that the set-aside program is not permitted under the federal regulations implementing the Surface Transportation and Uniform Relocation Assistance Act of 1987 because

the set-aside program violates state law, and because it is not needed to satisfy any goals under federal law.[1] (For simplicity, I will refer to the Surface Transportation and Uniform Relocation Assistance Act as the 1987 Surface Transportation Act and its predecessor as the 1982 Surface Transportation Act.) In Count III, plaintiffs challenge Wis.Stat. § 84.075 for the first time on an equal protection ground. This statute governs construction contracts with *minority* businesses (as opposed to disadvantaged businesses) and requires the Wisconsin Department of Transportation to ensure that 5% of the total amount expended on awarding construction contracts is paid to businesses certified by the department as minority businesses. In Count IV, plaintiffs contend that Wisconsin's efforts to meet its goals under the 1987 Surface Transportation Act are unconstitutional. These efforts include the establishment of the disadvantaged business set-aside program in Wis.Stat. § 84.076 but are not limited to that program. They also include the setting of goals for disadvantaged business subcontractor participation in projects that are not set aside for disadvantaged business prime contractors. Plaintiffs contend that defendants have set an arbitrary goal of 10% expenditure on disadvantaged business contracts which is unrelated to the effects of past discrimination in Wisconsin. They also contend defendants have denied or threatened to deny good faith waivers to contractors from individual project goals despite reasonable efforts by the contractors to secure bids from qualified disadvantaged business contractors. Finally, plaintiffs contend that because state law prohibits defendants from discriminating or from granting contracts to other than the lowest bidder, defendants must seek a waiver from the presumptive 1987 Surface Transportation Act goal of 10% disadvantaged business participation in federally funded projects.[2] Plaintiffs stated in their amended complaint that they

would seek to proceed as a class, but have since advised the court they would not pursue class certification.

This case is now before the court on the parties' cross-motions for summary judgment.

In their motion for summary judgment, defendants contend first that this case should be dismissed for failure to join the federal government as an indispensable party. Second, they challenge the justiciability of some of the issues raised in plaintiffs' amended complaint, contending that there is no case or controversy with respect to minority business, as opposed to disadvantaged business preferences, because the statutes enacting these minority preferences have never been implemented. Further, they assert that there is no case or controversy regarding their past practice of setting goals for disadvantaged business subcontractor participation on exclusively state funded projects because they ceased that practice in March 1989. Finally, defendants contend that this court lacks jurisdiction under the Eleventh Amendment to entertain plaintiffs' challenges based on rights created by state law.

Both parties have re-argued legal issues that were resolved in earlier rulings in this case, but without presenting additional facts that bear on these issues. I will not reconsider the ruling that the Wisconsin statute creates irrebuttable race, sex and national origin classifications. *Milwaukee County Pavers I*, 707 F.Supp. at 1031. I continue to hold that the Wisconsin set-aside program, as it has been applied thus far, is a subsidiary of the federal program under the 1987 Surface Transportation Act. *Milwaukee County Pavers II*, 710 F.Supp. at 1544.

The following issues remain for resolution on the parties' cross motions for summary judgment: (1) whether this case should be dismissed for plaintiffs' failure

---

1. Federal regulations provide that states shall establish set-asides "[w]here not prohibited by state or local law and determined ... to be necessary to meet [federal] goals". 49 C.F.R. § 23.45(k).

2. Federal regulations permit states to set goals of less than 10% based on "[I]egal or other barriers impeding the participation of disadvantaged businesses at at least a ten percent level." 49 C.F.R. § 23.65(d).

to join the federal government as an indispensable party; (2) whether there is any justiciable case or controversy regarding Wisconsin statutes that the state has never implemented or has represented it no longer implements; (3) whether defendants must make findings of past discrimination in Wisconsin to ensure that primarily federally funded set-aside projects are a narrowly tailored remedy for Congressional findings of past discrimination; (4) whether in fact the defendants administer their disadvantaged business set-aside program constitutionally in certifying disadvantaged businesses, in expending state funds, in setting goals for disadvantaged business subcontractors on projects set aside for disadvantaged prime contractors, and in extending the set-aside program to June 30, 1995; and (5) whether this court has jurisdiction over claims that the set-aside program violates Wisconsin statutory and constitutional law.

For the reasons that follow, I conclude first that plaintiffs' failure to join the federal government as a party does not constitute a ground for dismissal because the federal government has no legally cognizable interest in this case. Second, there is no case or controversy with regard to the minority business goals in Wis.Stat. §§ 84.-075 and 84.076(2) because it is undisputed that these sections have never been implemented. However, defendants' voluntary cessation of the practice of setting disadvantaged business enterprise participation goals on projects funded exclusively by the state does not deprive this court of jurisdiction over plaintiffs' challenge to the constitutionality of that practice. Third, it would be inconsistent with *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), to require states to make findings of prior discrimination to ensure that their implementation of the federal 1987 Surface Transportation Act requirements is narrowly tailored.

Fourth, insofar as defendants are required by federal law to spend state funds on primarily federally funded projects, the use of state funds does not alter the fact that the state is implementing a constitutional federal affirmative action program. However, the state's use of race-conscious relief is outside the bounds of federal authority and therefore unconstitutional in three respects: (1) in setting goals for disadvantaged business subcontractor participation in projects funded exclusively by the state, (2) in requiring disadvantaged business prime contractors to make good faith efforts to use disadvantaged business subcontractors, and (3) in extending the Wisconsin set-aside program past the date for which the 1987 Surface Transportation Act disadvantaged business enterprise program is authorized. Finally, this court lacks jurisdiction under *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), over plaintiffs' claims that defendants' disadvantaged business program violates Wisconsin's competitive bidding law, anti-discrimination statute and state constitution.

From the parties' proposed findings of fact and supporting materials, and for the purpose only of deciding this motion, I find there is no genuine issue as to the following material facts.

### Undisputed Facts

Plaintiff Milwaukee County Pavers Association is an association representing highway construction contractors in good standing with the Wisconsin Department of Transportation. The remaining plaintiffs (except Johnson Sand & Gravel, Inc. and Pac–Sac Construction, Inc.) are highway construction contractors in good standing with the Wisconsin Department of Transportation. Plaintiffs Johnson Sand & Gravel, Inc. and Pac–Sac Construction, Inc., were certified as disadvantaged firms at one time but were decertified by the Department on findings that they were not actually managed and controlled by disadvantaged individuals. No other plaintiff has applied for certification as a disadvantaged business. Plaintiffs bid routinely as prime contractors on the Department's highway projects or submit quotes as subcontractors for work on these highway projects.

Defendant Fiedler is Secretary of the Wisconsin Department of Transportation,

charged with the duty to implement and administer the disadvantaged business enterprise program. Defendant Manning is Disadvantaged Business Programs Director for the department.

### 1. Federal requirements for disadvantaged business participation

In 1983, Congress enacted a quadrennial transportation authorization act entitled the Surface Transportation Assistance Act of 1982, Pub.L. No. 97–424, 96 Stat. 2097, 2100. This act required each state receiving federal aid to make reasonable efforts to award at least 10% of the federal funds to firms owned and controlled by socially and economically disadvantaged individuals.

The subsequent authorization act, the Surface Transportation and Uniform Relocation Assistance Act of 1987, contained similar provisions. Pub.L. 100–17, § 106(c), 100 Stat. 133, 145. Section 106(c) of the Act contained language establishing a ten percent goal for expenditures with disadvantaged businesses. In addition, it included women as a group presumed to be disadvantaged; refined the definition of small business; required states to compile an annual listing of disadvantaged business enterprises; required states to conduct onsite visits of disadvantaged business enterprises; and required the Secretary of Transportation to establish minimum uniform criteria for states to use in determining whether a business is disadvantaged. The regulations implementing the 1982 and 1987 acts are codified at 49 C.F.R. § 23.

### 2. State receipt of federal highway funds

The Federal Highway Administration is the federal agency primarily responsible for administering federal highway aid programs in Wisconsin. The Wisconsin Department of Transportation and the Federal Highway Administration are parties to contracts for the receipt of federal highway funds. As a condition of receiving federal funding of state highway construction projects, Wisconsin must comply with federal rules regarding contracting generally, and regarding the 1987 Surface Trans-

portation Act disadvantaged business program in particular. 49 C.F.R. § 23.68.

The Wisconsin Department of Transportation has administered a disadvantaged business enterprise program since 1982. The department enters into a separate contract with the Federal Highway Administration for each individual highway project for which the state receives federal funds. Each contract must contain the following statement:

(1) Policy. It is the policy of the Department of Transportation that minority business enterprises (MBE's), as they are defined in 49 CFR Part 23 [for the purposes of 49 CFR Part 23, Subpart D, MBE's refer to disadvantaged business enterprises (DBE's); for the purposes of other subparts of Part 23, MBE's include women's business enterprises (WBE's) ], shall have the maximum opportunity to participate in the performance of contracts financed in whole or in part with Federal funds under the agreement. Consequently, all applicable requirements of 49 CFR Part 23 apply to this agreement.

(2) Obligation. The recipient or its contractor agrees to ensure that MBE's as defined in 49 CFR Part 23, have the maximum opportunity to participate in the performance of contracts and subcontracts financed in whole or in part with Federal funds provided under this agreement. In this regard, all recipients or contractors shall take all necessary and reasonable steps in accordance with the applicable section of 49 CFR Part 23 to ensure that MBE's have the maximum opportunity to compete for and perform contracts. Recipients and their contractors shall not discriminate on the basis of race, color, national origin, handicap, religion, age or sex, as provided in Federal and State law, in the award and performance of DOT-assisted contracts.

Under these contracts, the state is reimbursed by the federal government for funds it expends on federally approved projects. It receives approximately $200 million a year in federal highway funds.

### 3. Setting overall goals for expenditures on disadvantaged business enterprises

Recipients of federal highway assistance must set overall goals for participation by disadvantaged businesses that are "practical and related to the availability of [disadvantaged businesses] in desired areas of expertise." 49 C.F.R. § 23.45(g). Any overall goal of less than 10% must be justified with information concerning, among other things, the recipient's efforts to locate disadvantaged businesses, the recipient's efforts to make disadvantaged businesses aware of contracting opportunities, the availability of disadvantaged businesses, the size and other characteristics of the minority population in the recipient's jurisdiction, and legal or other barriers impeding the participation of disadvantaged businesses at a 10% level and the recipient's efforts to overcome or mitigate the effects of these barriers. 49 C.F.R. § 23.65.

In 1988 and 1989, the Wisconsin Department of Transportation set a goal of "not less than 10% of federal funds." The department did not consider setting a goal of less than 10% and did not consider the existence or effects of prior discrimination in setting the disadvantaged business enterprise goal. Its policy is to adhere as closely to 10% as possible, but not spend less. In 1987 it achieved a 13.1% expenditure and in 1988 projected 15.7% but achieved only 13.1%.

### 4. Certification of Disadvantaged Business Enterprises

States may certify as disadvantaged business enterprises only those businesses that meet the eligibility standards in 49 C.F.R. § 23.62. Under 49 C.F.R. § 23.62, a firm is disadvantaged if it is a small business concern and is owned and controlled by individuals who are socially and economically disadvantaged. The regulation adopts the definition of small business in the Small Business Act and imposes the additional requirement that the business concern may not have annual average gross receipts in excess of $14 million. States are directed to make a rebuttable presumption that women and members of specified racial and ethnic minority groups are socially and economically disadvantaged and to determine on a case-by-case basis whether individuals who are not members of those groups are socially and economically disadvantaged. Also, as part of its certification procedure, the state must provide a procedure through which third parties may challenge the certification of individuals presumed to be socially and economically disadvantaged. 49 C.F.R. § 23.69.

The Department of Transportation is primarily responsible for the certification of disadvantaged businesses in Wisconsin. The department requires applicants for disadvantaged business status to submit records such as birth certificates, visas, passports or driver's licenses to establish whether they fall within one of the presumptively disadvantaged categories. Also, all applicants must submit resumes, capital contribution documents showing how the individual acquired the ownership interest in the firm, loan agreements, lease agreements, individual and corporate income tax records, and titles to real estate and equipment connected with the firm. Each applicant must submit the same documentation, whether or not the applicant is presumed to be disadvantaged.

The process for determining whether an individual or firm is disadvantaged consists of a desk audit of the documentation and an on-site review to verify the existence of the business. District employees conduct the initial review and file a report and recommendation to the department's Madison office, where the application is reviewed.[3]

Certification does not depend on a showing that the individual or firm has been the

---

3. The parties dispute whether the certification of disadvantaged business firms focuses on the economic disadvantage of the individual or on the economic status of the firm. For reasons explained in the body of the opinion, I find this dispute to be immaterial. Because the dispute is not material, I have not addressed plaintiffs' motion to strike portions of David Manning's fifth affidavit relating to the facts underlying this dispute.

victim of prior discrimination or that the individual's access to contracting opportunities has been impaired by the effects of prior discrimination.

Wisconsin has found a white male disabled veteran of the Vietnam war to be socially and economically disadvantaged despite the fact that he did not fall within a presumptively disadvantaged category. Approximately five applicants in the non-presumptive categories have been rejected. Since 1982, the department has denied certification to or decertified 353 firms. Approximately 75% of those firms were denied certification because the department determined they were not actually owned and controlled by disadvantaged individuals. Most of the remainder were denied certification because they lacked the expertise or resources to operate successfully or because they did not complete the certification process and supply all the necessary information. Two prominent and wealthy black athletes applied and were rejected because the department found that they were not economically disadvantaged.

### 5. Setting individual project goals

One way that a state may achieve its overall goal is by setting individual goals for disadvantaged business subcontractor participation on each prime contract. 49 C.F.R. § 23.45(g)(2)(ii). Like the overall disadvantaged business participation goals, specific project goals must be "practical and related to the potential availability of [disadvantaged businesses] in desired areas of expertise." 49 C.F.R. 23.45(g)(1). Specific project goals must be based on "known availability of qualified [disadvantaged businesses]." 49 C.F.R. § 23.45(g)(7).

The Wisconsin Department of Transportation's basic methodology for setting goals consists of adding up those portions of a project that disadvantaged business contractors can perform, totalling the estimated project costs for this work, and dividing this figure by the total estimated project costs for all work. The project goal is set as a percentage of the total project costs, not the federal share of the project costs. The Federal Highway Administration does not permit states to apply federal regulations, such as a disadvantaged business enterprise goal requirement, to only the participating percentage portion of the contract that is federally funded.

In determining work that can be performed by disadvantaged businesses on a project, the department uses the following guidelines as maxima:

a. 20% of any work involving trucking;
b. 100% of pavement marking items, except 20% for epoxy items;
c. 100% of sawing items;
d. 100% of landscaping items;
e. 20% of bar steel items;
f. 100% of traffic control;
g. 100% of clearing and grubbing items;
h. 100% of curb and gutter items.

Using this framework, the department sets a benchmark which is then adjusted to be realistic in light of other considerations such as the time of the year the service is to be performed, the number of disadvantaged firms with the capacity to perform a particular task, and the disadvantaged firms' performance ability as measured by their equipment, other resources, and prime contractor complaints about them.

### 6. Granting good faith waivers from individual project goals

For all contracts on which disadvantaged business subcontractor participation goals have been established, the apparently successful prime contractor must submit information about the participation of disadvantaged firms before the state commits itself to the performance by the prime contractor. 49 C.F.R. § 23.45(h)(1). If the level of disadvantaged business participation does not meet the contract goals, the state may grant a waiver of the goals to the prime contractor if the state is satisfied that the prime contractor has made good faith efforts to meet the goals. 49 C.F.R. § 23.45(h)(2). Each state has discretion to consider whether, under all relevant circumstances, the contractor has "actively and aggressively" attempted to meet the goal. 49 C.F.R. 23.45, Appendix A, at 176.

The federal government has provided a non-exclusive, non-exhaustive list of the kinds of efforts that states may consider.[4] It is "not intended to be a mandatory checklist." *Id.*

One of the factors the Wisconsin Department of Transportation considers in deciding whether to grant prime contractors a good faith waiver is the price differentials between quotes from disadvantaged business contractors and non-disadvantaged business contractors. Until April 1987, it was the department's practice to presume that a 5% differential was insufficient to excuse a prime contractor from selecting a disadvantaged business subcontractor. The department also presumed that a differential of greater than 5% was excessive. The federal government reversed that practice and instructed the department it could not have an inflexible 5% rule. Since April 1987, it has been the department's practice to reject good faith waiver requests if the contractor does not meet the project goal and refuses to accept disadvantaged business enterprise quotes the department evaluates as reasonable. Defendant Manning determines whether disadvantaged firm quotes are reasonable on a case-by-case basis. He does not consider the specific effects of prior discrimination in determining whether a disadvantaged firm quote is reasonable.

The price differential between disadvantaged and non-disadvantaged firm quotes is not the dispositive factor in determining whether to grant a good faith waiver. The department policy is to look for sincere and reasonable efforts on the part of the contractor.[5] The department requires an in-

---

**4.** 49 C.F.R. § 23.45, Appendix A, contains the following list of factors:

(1) Whether the contractor attended any pre-solicitation or pre-bid meetings that were scheduled by the recipient to inform MBEs of contracting and subcontracting opportunities;
(2) Whether the contractor advertised in general circulation, trade association, and minority-focus media concerning the subcontracting opportunities;
(3) Whether the contractor provided written notice to a reasonable number of specific MBEs that their interest in the contract was being solicited, in sufficient time to allow the MBEs to participate effectively;
(4) Whether the contractor followed up initial solicitations of interest by contacting MBEs to determine with certainty whether the MBEs were interested;
(5) Whether the contractor selected portions of the work to be performed by MBEs in order to increase the likelihood of meeting the MBE goals (including, where appropriate, breaking down contracts into economically feasible units to facilitate MBE participation);
(6) Whether the contractor provided interested MBEs with adequate information about the plans, specifications and requirements of the contract;
(7) Whether the contractor negotiated in good faith with interested MBEs, not rejecting MBEs as unqualified without sound reasons based on a thorough investigation of their capabilities;
(8) Whether the contractor made efforts to assist interested MBEs in obtaining bonding, lines of credit, or insurance required by the recipient or the contractor;
(9) Whether the contractor effectively used the services of available minority community organizations; minority contractors' groups; local, state and Federal minority business assistance offices; and other organizations that provide assistance in the recruitment and placement of MBEs.

**5.** Plaintiffs attempt to dispute that this is the department's policy by submitting examples of instances in which the department denied good faith waivers on an apparently arbitrary basis. Their primary illustration consists of a comparison of bids submitted by defendant Cape & Sons and by Vinton Construction, neither of which met the DBE goals set for the project. Both contractors had refused to subcontract with Grandville Electric, a disadvantaged subcontractor whose quotation was 9% higher than the lowest bid for the subcontract. Defendants denied a good faith waiver to Cape & Sons and granted one to Vinton.

Plaintiffs urge this court to draw the inference that defendants arbitrarily decide whether a bid is reasonable. However, they have not supplied facts to demonstrate that Cape & Sons and Vinton had made similar efforts to locate disadvantaged businesses other than Grandville Electric. The mere fact that in one case a good faith waiver was granted and in the other case it was denied is insufficient to raise a dispute as to defendants' policy of granting good faith waivers when the price quoted by a disadvantaged subcontractor is unreasonable *and* the contractor has not made good faith efforts to locate other disadvantaged businesses. *See Fullilove v. Klutznick*, 448 U.S. 448, 470, 100 S.Ct. 2758, 2770–71, 65 L.Ed.2d 902 (1980) (before a waiver request will be honored, grantee of federal funds must determine that the price is unreasonable and that the contractor has "contacted other MBEs and has no meaningful choice but to accept an unreasonably high price.)

tensive effort on the part of prime contractors. Prime contractors may also be referred to the Department's disadvantaged business enterprise technical consultant, who helps prime contractors locate firms that have been certified as disadvantaged business enterprises and helps these firms find work.

### 7. Wisconsin's set-aside program

The federal implementing regulations permit states to use set-aside programs as one portion of an overall program to meet the goals set under the 1987 Surface Transportation Act. 49 C.F.R. § 23.45(k). The set-aside programs allow certain contracts to be awarded to the successful bidder from a pool of bidders limited exclusively to disadvantaged businesses. States may implement set-aside programs "[w]here not prohibited by state or local law and determined by the recipient to be necessary to meet [disadvantaged business enterprise] goals." *Id.*

In 1988, the Wisconsin legislature enacted the Disadvantaged Business Demonstration and Training Program. 1987 Wisconsin Act 399, codified as Wis.Stat. § 84.076. The program was adopted in response to complaints by non-disadvantaged prime contractors that disadvantaged business subcontractors were unable to perform satisfactorily and complaints by disadvantaged businesses that they were unable to compete with non-disadvantaged business-

es for prime contracts because of economic barriers they encountered.

In addition, the state believed it could meet its goal more efficiently by using a set-aside program. Under the federal regulations, the entire amount of federal dollars spent on a contract awarded to a disadvantaged prime contractor is counted toward the 10% goal even if portions of the contract are subcontracted to non-disadvantaged businesses. On the other hand, when a project is let to a non-disadvantaged business prime contractor, only the money spent on subcontracts with disadvantaged businesses may be counted toward the goal. By setting aside certain projects for bidding by only disadvantaged businesses prime contractors, the state is able to count all of the federal money spent on the project toward its goal, even if some of the subcontractors are not disadvantaged businesses.

The Wisconsin set-aside program directs the secretary to allocate $4,000,000 each fiscal year for the awarding of contracts to certified disadvantaged business enterprises. Wis.Stat. § 84.076(2)(a). On its face, the program applies to projects funded with state, local and federal appropriations. *Id.* However, the set-aside program has never been applied to projects funded exclusively by the state and it is the department's policy to apply it only to projects for which federal aid is sought.[6]

Initially, the Wisconsin set-aside program was designed to end on June 30, 1991.

---

6. Plaintiffs rely on minutes from the July 19, 1988 meeting of the Transportation Advisory Committee to attempt to put this fact into dispute. At the meeting, defendant Manning explained the recently-enacted set-aside program. The minutes state "Both State and Federal projects may be included in the demonstration program." However, the author of the minutes, Eugene Johnson, has sworn,

> of my own personal knowledge I know that the phrasing was used to distinguish between those projects already earmarked for federal assistance and those state projects that could be earmarked in the future as part of the selection process for projects that would be suitable for federal funding and inclusion in the DBE demonstration program.

In addition, defendant Manning has testified,

> I can tell you that when the projects were first selected [for the set-aside program] they were

not federally funded projects, and we insisted and put them through the paper work necessary to convert them over to federally funded before we accepted them into the program ... We had made a commitment to the Wisconsin Road Builders Association and to the disadvantaged businesses that this was going to be an extension of a federal program, that any dollars that we achieved in this program would be counted towards our regular 10 percent overall goal. And without having it federally funded, you couldn't do that.

June 23, 1989 deposition of David Manning at 71–72.

Given this undisputed testimony, I find plaintiffs' speculations concerning the meaning of the committee minutes insufficient to raise a dispute concerning the intent to apply the set-aside program only to federally funded projects.

1987 Wisconsin Act 399, § 305rh. The deadline has now been extended to June 30, 1995. 1989 Wisconsin Act 31 § 2198ho, codified as Wis.Stat. § 84.076(5).

The set-aside program itself includes requirements for disadvantaged business participation on projects let to disadvantaged business prime contractors. Each bid by disadvantaged prime contractors must include a goal that at least 25% of the total number of workers in all trades employed on the project will be disadvantaged individuals and a subcontracting plan "that provides sufficient detail to enable the secretary to determine that the prime contractor has made or will make a good faith effort to award at least 20% of the total contract amount to bona fide independent disadvantaged business subcontractors." *Id.* States may use set-asides to meet their federal goals under the 1987 Surface Transportation Act "only in cases where at least three [disadvantaged business enterprises] with capabilities consistent with contract requirements exist so as to permit competition." 49 C.F.R. § 23.45(k). On June 20, 1989, the department let two projects under Wisconsin's set-aside program. On one of these projects, only one bid was submitted. No bids were submitted on the second project. However, prior to letting these projects, defendant Manning prepared a memorandum listing four disadvantaged firms considered qualified to bid on one project and seven disadvantaged firms considered qualified to bid on the other project.

### 8. *Wisconsin's minority business provisions*

In addition to Wisconsin's efforts to identify and involve *disadvantaged* businesses, there are two state statutory provisions relating specifically to *minority* businesses.

First, in 1984 the Wisconsin legislature enacted Wis.Stat. § 84.075, entitled "Contracting with Minority Businesses." 1983 Wisconsin Act 27 § 1329r, 1983 Wis.Laws 426–27. The statute controls expenditures for highway improvement construction contracts and for state trunk highway maintenance contracts. Wis.Stat. § 84.075(1). It requires the department to "attempt to ensure that 5% of the total amount expended in each fiscal year is paid to contractors, subcontractors and vendors which are minority businesses." *Id.* It further provides that in attempting to meet the 5% goal, the department "may award any contract to a minority business that submits a qualified responsible bid that is no more than 5% higher than the low bid." *Id.*

Wis.Stat. § 84.075 has never been implemented.[7]

Second, the statute creating the disadvantaged business set-aside program contains a minority business goal. It provides

---

7. Plaintiffs attempt to dispute this fact by arguing, "until March 1989, the department set project goals on state funded projects, presumably pursuant to § 84.075, Stats. Plaintiffs are aware of no other authority for state project DBE goals." Plaintiffs do not cite to any evidence in the record to support their contention that the state project goals were set pursuant to Wis.Stat. § 84.075.

However, the deposition testimony of defendant Manning explains the genesis of the state funded project goals as follows:

That was a policy [to set project goals for state funded projects] that was put down by then Secretary Lowell Jackson. The rationale was to try to have—this only applied, by the way, to projects located in the southeastern part of Wisconsin, meaning Milwaukee basically, where 70 percent of our DBE firms are located. And there was a request from the DBE community at that time that ... there were projects that they could participate on, that

were known, but they couldn't participate on them because there were no goals on them. And if there were no goals, that meant the prime contractors were indisposed to using them. So Lowell Jackson said that in some cases the district should be free to set goals on some of these ideal projects where DBEs ought to and could be used. That was the rationale for the policy.

June 23, 1989 deposition of David Manning at 38. Manning also testified that although there were goals on certain state funded projects, "there was no overall goal for state-funded projects only. It was just a haphazard situation on individual projects only." *Id.* at 41.

Plaintiff's speculation that the goals were set pursuant to Wis.Stat. § 84.075 does not put into dispute the testimony of James Thiel, general counsel for the department that "in no instance has 84.075 ever been applied by this department. It's a dormant statute."

separate definitions for "disadvantaged business," and "minority business." Wis. Stat. § 84.076(1).[8] § 84.076(2) requires the secretary to "attempt to ensure that 75% of the amount ... allocated each fiscal year [under the set-aside program] is for the awarding of contracts under this section to minority businesses." It is the department's policy not to implement this portion of the statute.[9]

### 9. Use of state funds for disadvantaged business contracts

Until March 1989, the department set goals for disadvantaged business subcontractor participation on some projects funded exclusively by the state. The policy of setting goals on exclusively state funded projects was initiated by former department secretary Lowell Jackson in response to requests from the disadvantaged business community that the department create an incentive for prime contractors on certain known state funded projects to use disadvantaged business subcontractors. These goals were set on a haphazard basis, primarily in southeastern Wisconsin and were not part of an attempt to reach any overall goal for disadvantaged business participation on exclusively state funded projects. The department terminated the policy in March 1989 because of the possibility it might fall within the scope of the preliminary injunction in this case.

State funds are also expended as matching funds on the projects for which the state receives federal highway funds. These include projects set aside under § 84.076 and non-set-aside projects on which the state sets disadvantaged business subcontractor participation goals. Federal law sets the relative state-federal financing share; the federal share is at least 75% unless the state elects to contribute a larger share. 23 U.S.C. § 120. Wis-

consin has never made an election to exceed 25% of the funding for its state highway improvement program. Only the federal funds expended under the contracts count toward the 10% goal. In 1988, approximately $4.158 million of state money was awarded to disadvantaged businesses. In 1989, $5 million of state money will be awarded to disadvantaged businesses.

## OPINION

### A. Joinder of the Federal Government

A threshold issue is whether this case should be dismissed for plaintiffs' failure to join the federal government as an indispensable party under Fed.R.Civ.P. 19, as defendants contend. Rule 19 requires the joinder of any party who claims an interest relating to the subject of the action and is so situated that the disposition of the action in the absence of that party would leave persons already parties "subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations." Fed.R.Civ.P. 19(a)(2)(ii). Defendants argue that Congress's conditioning of $200 million of highway funds on compliance with the 1987 Surface Transportation Act would create inconsistent obligations if plaintiffs succeeded in obtaining an order enjoining defendants from complying with the Act.

▮▮▮ The federal government is not an indispensable party in this case. The question whether failure to join a party would expose an existing party to inconsistent obligations is contingent upon an initial requirement that the absent party have a legally cognizable interest in the subject matter of the suit. *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030 (9th Cir.1983). Defendants assert that the federal government has an interest in plaintiffs' challenges to the constitutionali-

---

8. The definition of "disadvantaged business" incorporates federal administrative procedures for making and challenging findings of social and economic disadvantage. Wis.Stat. § 84.076(1)(a). The definition of "minority business" incorporates state definitions in Wis. Stat. § 560.036.

9. Plaintiffs attempt to put this fact into dispute by asserting that "the states's policy is set forth in the statute and the department is obligated to comply with the statute." This is insufficient to put into dispute deposition testimony of defendant Manning that the Department has not carried out the directive in Wis.Stat. § 84.076(2) to insure that 75% of contract awards go to minority businesses.

ty of defendants' disadvantaged business program but do not elaborate on the source or nature of that interest. Defendants appear to ground the federal government's interest on the ruling in *Milwaukee County Pavers II* that the state's disadvantaged business program is an extension and implementation of congressional legislation. 710 F.2d at 1546. However, plaintiffs' challenges to the constitutionality of Wisconsin's disadvantaged business program are directed toward the state's implementation of the federal legislation, not toward the federal legislation itself. On the converse of this question, the Court of Appeals for the Fifth Circuit ruled that a state is not an indispensable party when the complaint was "directed primarily at the constitutionality of a federal statute ... and not at the procedures employed by [the state]" to implement it. *Romero v. United States,* 784 F.2d 1322, 1325 (5th Cir.1986).

Failure to join the federal government does not require dismissal of this case.

### B. Justiciability Questions

#### 1. Minority business statutes

■ The power of a federal court to rule on the constitutionality of a statute can be exercised only if the interests of the litigants require the use of judicial authority for protection against actual interference with their rights. *J.N.S., Inc. v. State of Indiana,* 712 F.2d 303, 305 (7th Cir. 1983), *citing Golden v. Zwickler,* 394 U.S. 103, 110, 89 S.Ct. 956, 960–61, 22 L.Ed.2d 113 (1969); *United Public Workers of America v. Mitchell,* 330 U.S. 75, 89–90, 67 S.Ct. 556, 564–65, 91 L.Ed. 754 (1947). Plaintiffs need not await the actual enforcement of a statute to bring a challenge to its legitimacy, but, they cannot present a justiciable controversy unless they can show that the threat of enforcement has immediate coercive consequences. *Nuclear Engineering Co. v. Scott,* 660 F.2d 241, 252 (7th Cir.1981). Uncertain or speculative business injury will not support a finding that an actual controversy exists. *Id.*

■ It is undisputed that the Wisconsin Department of Transportation has never implemented the 5% minority business goal in Wis.Stat. § 84.075 and the portion of Wis.Stat. § 84.076(2)(a) that requires that 75% of the $4 million set-aside be allocated to minority businesses. Plaintiffs have presented no evidence to suggest that their business interests have been harmed or impaired in any way by threatened enforcement of these minority business statutes. Therefore, because plaintiffs fail to allege an actual case or controversy with respect to these statutes, I decline to exercise jurisdiction over challenges to their constitutionality.

#### 2. Mootness of challenges to disadvantaged business subcontractor goals on exclusively state funded projects

■ It is well established that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. *City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289, 102 S.Ct. 1070, 1074–75, 71 L.Ed.2d 152 (1981). For a defendant's voluntary cessation to render a case moot, (1) there must be no reasonable expectation that the alleged violation will recur, and (2) the effects of the alleged violation must have been completely and irrevocably eradicated. *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1978). In a voluntary cessation case, the defendant bears a heavy burden to persuade the court that a controversy is moot. *Ragsdale v. Turnock,* 841 F.2d 1358, 1365 (7th Cir. 1988).

■ Defendants have not met this burden with respect to the constitutionality of disadvantaged business subcontractor participation goals on exclusively state funded projects. It is undisputed that, in the past, defendants set such goals on projects that were funded exclusively by the state, and that they terminated this practice in March 1989 as a result of uncertainty about the scope of the preliminary injunction entered in this case. Because defendants ceased setting goals on state projects only after this court entered preliminary injunctive relief, it is not reasonable to assume that they will continue to refrain in the future

**1408**

from setting such goals absent judicial intervention. There remains a live case or controversy with respect to the constitutionality of the state's policy of setting goals for disadvantaged business subcontractor participation on exclusively state funded projects.

### C. Constitutionality of Wisconsin's Disadvantaged Business Preferences

#### 1. Legal background

As plaintiffs note in their brief, the issues in this case bring into focus the interaction between two benchmark affirmative action cases, *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), and *City of Richmond v. Croson*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). In *Fullilove*, the Supreme Court rejected a facial challenge to the constitutionality of a federal affirmative action statute requiring that 10% of federal funds granted for local public works projects be used to procure services or supplies from minority businesses. In *Croson*, the Court struck down a state minority business set-aside program enacted for the purpose of promoting wide participation by minority business enterprises in the construction of public projects.

The most important distinction between the federal program held constitutional in *Fullilove* and the state program held unconstitutional in *Croson* is Congress's power to "provide for the general Welfare of the United States" and "to enforce, by appropriate legislation," the equal protection guarantees of the Fourteenth Amendment. Art. I, § 8, cl. 1; Amend. 14, § 5. *Fullilove*, 448 U.S. at 472, 100 S.Ct. at 2771. In *Fullilove*, the Court held that it was because of these powers that Congress "acted within its competence" in imposing an affirmative action program to remedy nationwide discrimination in the construction industry. *Id.* at 478, 100 S.Ct. at 2774. In *Croson*, the Court held that

> unlike any State or political subdivision, [Congress] has a specific constitutional mandate to enforce the dictates of the

Fourteenth Amendment. The power to "enforce" may at times also include the power to define situations which *Congress* determines threaten principles of equality and to adopt prophylactic rules to deal with those situations.

*Croson*, 488 U.S. at ——, 109 S.Ct. at 719, citing *Katzenbach v. Morgan*, 384 U.S. 641, 651, 86 S.Ct. 1717, 1723–24, 16 L.Ed.2d 828 (1966) (emphasis in the original). In contrast to Congress's broad power to identify and remedy past discrimination, states "must identify that discrimination, public or private, with some specificity" to gain the authority to impose race-conscious relief. *Croson*, 488 U.S. at ——, 109 S.Ct. at 727.

In *Milwaukee County Pavers I*, I granted a preliminary injunction against the implementation of Wisconsin's disadvantaged business enterprise set-aside program on the ground that the program was supported by only "generalized and conclusory" evidence of past discrimination which was insufficient to meet the rigorous requirements of *Croson*.[10] 707 F.Supp. at 1028. However, I left open the possibility that the state program was a "mere elaboration on the federal scheme" in the 1987 Surface Transportation Act, and that if it were, the state could rely on congressional findings of past discrimination. *Id.* at 1031.

Defendants moved to dissolve the preliminary injunction based on evidence concerning the relationship of Wisconsin's disadvantaged business program to the federal program in the 1987 Surface Transportation Act. *Milwaukee County Pavers II*, 710 F.Supp. at 1534. In deciding that motion, I found as fact that the Wisconsin disadvantaged business program "is properly considered a subsidiary element of the federal legislation," and concluded that the state could rely on the congressional findings underlying the 1987 Surface Transportation Act. *Id.* at 1546. Therefore I applied a *Fullilove* analysis to Wisconsin's disadvantaged business set-aside program.

---

**10.** Plaintiffs challenged only the set-aside program in their original complaint.

In *Fullilove,* the Court looked first to the objectives of the legislation to see whether they were within the power of Congress. 448 U.S. at 473, 100 S.Ct. at 2772. It was in this step of the analysis that the Court analyzed Congress's power to make the required findings of past discrimination. After determining that Congress had the institutional authority to make findings of past discrimination under the enforcement clause of the Fourteenth Amendment, the Court looked at Congress's employment of racial and ethnic classifications to determine whether it was narrowly tailored to the goal of remedying prior discrimination. *Fullilove* 448 U.S. at 480, 100 S.Ct. at 2775–76.

In applying this analysis to Wisconsin's disadvantaged business set-aside program, I found first that in enacting the 1987 Surface Transportation Act, "Congress had before it ample evidence of past discrimination in the construction trade and could constitutionally enact race-conscious remedies and impose them upon the states." *Milwaukee County Pavers II,* 710 F.Supp. at 1549. Because the state's implementation of the federal program included an administrative waiver procedure, employed rebuttable presumptions of economically disadvantaged status, was of limited duration, and had a reasonable goal, I concluded that it was narrowly tailored to remedy the discrimination identified by Congress. *Id.* at 1550. Therefore, I dissolved the preliminary injunction insofar as it enjoined the letting of primarily federally funded programs under the state set-aside program. *Id.* at 1552.

## 2. Narrow tailoring of Wisconsin's implementation of the federal disadvantaged business enterprise program

In the briefs supporting their motion for summary judgment, plaintiffs concede the constitutionality of the federal act and Congress's authority to enact race-conscious relief based on evidence of nation-wide discrimination in the construction trade. What they challenge is Wisconsin's implementation of the disadvantaged business enterprise program in the 1987 Surface Transportation Act on the ground that it is not narrowly tailored.

### a. Necessity of findings of past discrimination

As a starting point, plaintiffs renew their argument that the state must ground its use of race-conscious relief on findings of past discrimination within the state. Instead of arguing that the state's administration of the 1987 Surface Transportation Act is governed by *Croson,* plaintiffs argue now that a state must make findings of past discrimination in order to ensure that the federal program it administers is narrowly tailored under *Fullilove.* Pointing out that *Fullilove* involved a facial challenge to a congressional statute and did not address the constitutionality of a state's implementation of that statute, plaintiffs argue that *Fullilove* requires defendants to use findings of past discrimination in the state as a benchmark in setting overall goals under the 1987 Surface Transportation Act, in certifying disadvantaged businesses, in setting individual project goals, and in granting good faith waivers to prime contractors.

Plaintiffs' position is not without textual support. In upholding the congressional remedy in *Fullilove,* the Court stated,

It is also contended that the MBE program is overinclusive—that it bestows a benefit on businesses identified by racial or ethnic criteria which cannot be justified on the basis of competitive criteria or as a remedy for the present effects of identified prior discrimination. It is conceivable that a particular application of the program may have this effect; however, the peculiarities of specific applications are not before us in this case. We are not presented here with a challenge involving a specific award of a construction contract or the denial of a waiver request; such questions of specific application must await future cases.

448 U.S. at 486, 100 S.Ct. at 2779. In discussing the administrative scheme of the minority business program challenged in *Fullilove,* the Court makes repeated reference to whether the program is tailored to

remedy only the effects of prior discrimination. *Id.* at 481–82, 100 S.Ct. at 2776–77. The Court also notes,

> Petitioners have mounted a facial challenge to a program developed by the politically responsive branches of Government. For its part, the Congress must proceed only with programs narrowly tailored to achieve its objectives, subject to continuing evaluation and reassessment; administration of the programs must be vigilant and flexible; and, when such a program comes under judicial review, courts must be satisfied that the legislative objectives and projected administration give reasonable assurance that the program will function within constitutional limitations.

*Id.* at 490, 100 S.Ct. at 2781.

Despite the clear emphasis in *Fullilove* on remedying prior discrimination, it would be inconsistent with the reasoning of the overall opinion to adopt plaintiffs' interpretation. By requiring states to make findings of past discrimination to meet the "narrowly tailored" requirement, plaintiffs conflate the two-step analysis set out in *Fullilove*. This blurring of the line between Congress's authority to make findings of past discrimination and the means it employs to address that discrimination threatens to eviscerate Congress's unique remedial power. As the court stated in *Fullilove*,

> It is fundamental that in no organ of government, state or federal, does there repose a more comprehensive authority to enforce equal protection guarantees. Congress may not only induce voluntary action to assure compliance with existing federal statutory or constitutional anti-discrimination provisions, but also, where Congress has authority to declare certain conduct unlawful, *it may, as here, authorize and induce state action to avoid such conduct.*

*Id.* at 483–84, 100 S.Ct. at 2777 (emphasis added). If Congress's power to authorize and induce state action were reduced in implementation to the redress of specific identifiable instances of discrimination, Congress's remedial power would be no different from the remedial power of a court. It may have been in response to this concern that Justice Burger closed his opinion in *Fullilove* with quotes from former Justices Jackson and Brandeis admonishing the courts to restrain themselves from encroaching on the province of the legislature. *Id.* at 490–91, 100 S.Ct. at 2780–81.

b. Rebuttability of economic disadvantage

In *Milwaukee County Pavers II*, I identified five factors in *Fullilove* that are important to a determination whether a race-conscious remedial program is narrowly tailored. 710 F.Supp. at 1550. One of these factors was that the "[t]he criteria of eligibility are rebuttable, thus assuring that only minorities who are economically disadvantaged may participate in the program." *Id.* Plaintiffs now contend that defendants' implementation of the disadvantaged business program is not narrowly tailored because defendants do not make adequate inquiry into the economic disadvantage of applicants for disadvantaged business enterprise status, making the presumption of disadvantaged status irrebuttable as applied by defendants.

Plaintiffs' argument is based on their allegation that in reviewing applications for certification as a disadvantaged business enterprise, defendants look at the financial status of the firm, not at the economic status of the socially disadvantaged individuals who have ownership interests or control in the firm. As discussed above, defendants dispute this characterization of the facts, asserting that they look at economic disadvantage at both the firm and the individual level.

The parties' dispute is immaterial to a determination whether the program is narrowly tailored, as shown by an examination of the minority business certification procedures discussed in *Fullilove*. The minority business enterprise program was held to be a narrowly tailored remedy because, in part, it provided "an administrative mechanism ... to ensure that only bona fide MBE's are encompassed by the remedial program." *Fullilove*, 448 U.S. at 482, 100

S.Ct. at 2776. In summarizing these administrative mechanisms, the Court referred to economic disadvantage at both the individual and firm levels:

> It will be recalled that in the Report of the House Subcommittee on SBA Oversight and Minority Enterprise the Subcommittee took special care to note that when using the term "minority" it intended to include "only such minority *individuals* as are considered to be economically or socially disadvantaged." The Subcommittee also was cognizant of existing administrative regulations designed to ensure that *firms*, maintained on the lists of bona fide minority business enterprises be those whose competitive position is impaired by the effects of disadvantage and discrimination.

*Id.* at 471, 100 S.Ct. at 2771 (emphasis added).

The economic status of the firm and the individual are each relevant to a determination whether the firm should be certified as a disadvantaged business enterprise (and may well be interconnected).

### 3. Extent of state's authority under federal law

Plaintiffs challenge three aspects of defendants' use of disadvantaged business preferences as unconstitutional because they are allegedly outside the bounds of federal authority: (1) the use of state funds that do not count toward the federal goal; (2) the requirement that disadvantaged prime contractors make good faith efforts to use disadvantaged subcontractors on projects let under the set-aside program; (3) the letting of projects under the set-aside program when fewer than three disadvantaged businesses submit bids.

#### a. State expenditures

According to plaintiffs, defendants misuse state funds in three ways: (1) using state matching funds on primarily federally funded projects; (2) setting disadvantaged business subcontractor goals based on total project costs rather than on the federal share of project costs; and (3) setting goals for disadvantaged subcontractor partic-ipation in projects funded exclusively by the state.

The earlier opinions in this case did not distinguish between the set-aside program and the department's other efforts to meet its overall goal under the 1987 Surface Transportation Act, because plaintiffs were challenging only the set-aside program in Wis.Stat. § 84.076. In addition to setting aside projects for bidding only by disadvantaged prime contractors, the Wisconsin Department of Transportation sets goals for participation by disadvantaged subcontractors on individual projects that are not part of the set-aside program. To date, the department has let only primarily federally funded projects under the set-aside program. However, the state has set goals for disadvantaged subcontractor participation on both primarily federally funded projects and on exclusively state funded projects. In *Milwaukee County Pavers II,* I concluded that "insofar as the statute permits the allocation of funds that are not primarily federal or projects that are not primarily federally funded, it cannot be considered part of the federal legislation." 710 F.Supp. at 1551. I noted that

> [t]he same analysis and conclusions would not apply if the monies were not primarily federal and were not counted toward the 10% goal. Then the state program would be more akin to a state program modeled on a federal program than one implementing and subsidiary to a federal program.

*Milwaukee County Pavers II,* 710 F.Supp. at 1544. I did not address what percentage of the money spent on a project must be federal for the project to be deemed primarily federally funded, but held that projects that receive 70–75% of their funding from federal sources meet the requirement. *Id.* at 1544, n. 6.

In light of the more specific challenges in plaintiffs' amended complaint, it is necessary to examine more closely the constitutionality of state expenditures under Wisconsin's disadvantaged business program. I conclude that it is not *per se* unconstitutional for defendants to allocate state or local expenditures

for use on contracts with disadvantaged businesses. What is important to a determination of constitutionality is not the source of the funds, but the source of the state's authority for spending the funds. Where federal law dictates that a project must be partially funded by the state, the expenditure of state funds does not cause the program to lose its character as a federal program. However, when the state provides race-conscious relief that bears no relationship to meeting its overall goal under the 1987 Surface Transportation Act, it is acting on its own and must base its action on state findings of prior discrimination.

First, regarding the partial state funding of federally funded projects, it is federal law that requires states to provide matching funds for federally funded highway projects and sets the relative state-federal financing share. 23 U.S.C. § 120. Unless the state elects to provide a greater share, the federal share for projects that require state matching funds is always at least 75%. *Id.* It is undisputed that Wisconsin has never made the necessary election to increase its share of the funding on the federal projects. However, even if it did, under the analysis I now apply, the state would stay within its role as implementor of a federal program and retain the authority to impose race-conscious relief based on congressional findings of prior discrimination.

■ Second, it follows from this ruling that the state is within the bounds of federal authority when it uses the total project costs to set individual goals for disadvantaged business subcontractor participation on projects that receive federal funding. Federal regulations require that goals set on specific contracts be based on the known availability of qualified disadvantaged businesses. 49 C.F.R. § 23.45(g)(7). Plaintiffs do not dispute the fact that the Federal Highway Administration does not permit states to apply this requirement to only the portion of the project that is federally funded. When the state is required to contribute 25% of the costs of the project, only 75% of the money actually spent on disadvantaged business subcontractors will be counted toward the overall federal goal. However, this result is dictated by the requirement that 10% of the *federal* money received by the state must go to disadvantaged businesses. It does not limit the state's authority to set goals based on the total project costs.

Third, it follows also from this analysis that when the state sets individual project goals for disadvantaged business participation in projects funded only by the state, it is not acting to implement a federal program. The goals for subcontractor participation set on exclusively state funded projects bear no relationship to the 1987 Surface Transportation Act. None of the money spent on these projects counts toward the federal goal or any other overall goal. The goals are set in direct response to requests from the disadvantaged business community for more work. Although the state complements the legislative purposes of the 1987 Surface Transportation Act in providing additional incentives for contractors to use disadvantaged subcontractors, it has taken this action without making the necessary findings that the disadvantaged subcontractors were victims of past discrimination, and therefore has acted unconstitutionally.

■ Defendants argue that even if it is unconstitutional for the state to set disadvantaged business subcontractor goals on exclusively state funded projects, plaintiffs are not entitled to injunctive relief because defendants' actions in setting disadvantaged business subcontractor goals on exclusively state funded projects were "isolated prior incidents." Defendants cite *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) and *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), for the proposition that plaintiffs may not request injunctive relief based on isolated incidents, and argue that even if plaintiffs had standing, disadvantaged business goals are based on disadvantaged status and not race, national origin or gender and are therefore constitutional.

Defendants' arguments are unconvincing. In both *Lyons* and *Rizzo*, the Court held that the plaintiffs lacked standing to challenge alleged constitutional violations because they failed to demonstrate that the violations were committed pursuant to a deliberate policy or pattern endorsed or authorized by city officials. *Lyons*, 461 U.S. at 106, 103 S.Ct. at 1667; *Rizzo*, 423 U.S. at 374, 96 S.Ct. at 605–06. By contrast, in this case plaintiffs challenge a deliberate policy by former Department Secretary Lowell Jackson to increase disadvantaged business participation in state projects in the Milwaukee area. Defendants' persistence in arguing that these goals are not based on race, national origin or gender based, despite the ruling to the contrary in *Milwaukee Pavers I* and my reaffirmation of that ruling in *Milwaukee County Pavers II*, 710 F.Supp. at 1539 n. 2, serves as additional demonstration of the need for injunctive relief in this case.

Therefore, I conclude that defendants are constitutionally permitted to apply state matching funds to primarily federally funded projects and that the practice of using the total project costs to set disadvantaged business subcontractor participation goals on these projects is constitutional. However, plaintiffs are entitled to injunctive relief against the setting of disadvantaged business subcontractor participation goals on exclusively state funded projects in the future.

    b.  Disadvantaged business subcontractor participation goals on projects set aside for disadvantaged business prime contractors

▮▮▮ Plaintiffs contend that there is no federal authority for the state's enactment of a requirement in Wis.Stat. § 84.076(3)(b) that disadvantaged prime contractors make good faith efforts to use disadvantaged subcontractors. Section 84.076(3)(b) provides,

> Each bid submitted under [the disadvantaged business set-aside program] shall include the following conditions: ... A subcontracting plan that provides sufficient detail to enable the secretary to determine that the prime contractor has

made or will make a good faith effort to award at least 20% of the total contract amount to bona fide independent disadvantaged business subcontractors.

This issue is similar to those concerning the expenditure of state funds and the same analysis applies. The controlling analysis centers on determining how the implementation of the 1987 Surface Transportation Act relates to the requirement that disadvantaged business prime contractors use disadvantaged subcontractors.

The imposition of the additional goals for disadvantaged subcontractor participation on projects let to disadvantaged business prime contractors serves no purpose in the implementation of the 1987 Surface Transportation Act. Under the Act, federal money spent on projects let to disadvantaged prime contractors will count toward the 10% goal whether or not the subcontractors are disadvantaged businesses. 49 C.F.R. § 23.47(a). It is only when the prime contractor is not a disadvantaged business that the status of the subcontractors becomes relevant under the federal regulations. Ultimately, the federal approach may undermine the purpose of developing a pool of competitive disadvantaged businesses in the state, because it permits a state to meet its overall goal by using disadvantaged prime contractors who then subcontract to non-disadvantaged businesses. However, the federal regulations provide a safeguard against using disadvantaged prime contractors as a "front" for work that is being disproportionately performed by subcontractors. A state receiving federal funds may count toward its goals only expenditures to disadvantaged businesses that "perform a commercially useful function." 49 C.F.R. § 23.47(d)(1). The regulation goes on to state

> If an MBE contractor subcontracts a significantly greater portion of the work of the contract than would be expected on the basis of normal industry practices, the MBE shall be presumed not to be performing a commercially useful function.

49 C.F.R. § 23.47(d)(2). Whatever the merits of the federal regulations, it is undisput-

ed that it was this feature of the federal program that led Wisconsin to enact a set-aside program as a more efficient way to meet its overall goal under the 1987 Surface Transportation Act.

Defendants' subcontractor requirement in the set-aside program may well contribute to the overall purpose of enhancing the pool of disadvantaged competitors, which is in line with the purposes of the federal program. However laudable its goals, Wisconsin may not pursue that purpose under the guise of implementing the federal program. Wis.Stat. § 84.076(3)(b) is without federal authorization and is therefore unconstitutional.

### c. Three-bid requirement for set-aside program

■ Among plaintiffs' challenges to the administration of Wisconsin's disadvantaged business set-aside program is the contention that the failure of three bidders to come forward on each project strips the program of its federal authorization. According to the federal regulations under the 1987 Surface Transportation Act, set-asides can be used only when there exist at least three disadvantaged businesses "with capabilities consistent with contract requirements exist so as to permit competition." 49 C.F.R. § 23.45(k). In June 1989, the department let two projects under the set-aside program. On one project only one bid was submitted; no bids were submitted on the second project.

Plaintiffs' argument is disingenuous. On its face, the federal regulation requires only that qualified disadvantaged business enterprises *exist*, not that they actually submit bids. Furthermore, a requirement that three disadvantaged firms bid on each project in order to permit states to enact set-aside programs would be administratively unworkable. Defendants cannot control the number of qualified disadvantaged contractors that come forward to bid on set-aside projects.

It is undisputed that before letting these projects, defendant Manning prepared a memorandum listing at least three disadvantaged firms qualified to bid on each project. This was sufficient to meet the requirements in the federal regulations.

### 4. Sunset provision

Finally, plaintiffs challenge the new sunset provision of June 30, 1995 on grounds both that it is without federal authorization and that it causes the program to lose its narrow tailoring. In *Milwaukee County Pavers II*, I ruled that defendants' implementation of the federal act was narrowly tailored, in part because "[t]he state program is also of limited duration, expiring in 1990." 710 F.Supp. at 1550. Since this ruling was made, the Wisconsin legislature extended the set-aside program until June 30, 1995. 1989 Wisconsin Act 31, § 2198ho, creating Wis.Stat. § 84.076(5).

This change not only adds to the program's duration, it also extends it beyond the limits of the 1987 Surface Transportation Act, which expires in 1991. H.R.Conf. Rep. No. 27, 100th Cong., 1st Sess. 147, *reprinted in* 1987 U.S.Code Cong. & Admin.News 121, 132. Defendants contend that this challenge is not yet ripe because it is not yet known whether Congress will extend the program past 1991. Defendants point out that Congress always appropriates for limited numbers of years and that it is therefore inappropriate to view the 1991 date as a sunset provision.

■ The constitutionality of the state's program depends on its character as an implementation of the federal program. To the extent that the state steps beyond the boundaries of this federal authority, it is acting on its own authority and must base its action on specific findings of identifiable prior discrimination. Congress has authorized the disadvantaged business program in the 1987 Surface Transportation Act through 1991. It is within the power of the Wisconsin legislature to extend its set-aside program beyond 1991, but it cannot do so on the basis of Congress's authority to find prior discrimination. Therefore, I conclude that Wis.Stat. § 84.076(5) is unconstitutional in this respect to the extent that it authorizes the existence of the set-aside program beyond the date through which the disadvantaged business

enterprise program in the 1987 Surface Transportation Act is authorized.

However, I do not mean to imply that a four-year extension of the disadvantaged business set-aside defeats a claim that the program is narrowly tailored. Extending the program through 1995 does not change the basic fact that it is a program of limited duration. If and when Congress extends the authority for appropriations under the 1987 Surface Transportation Act through 1995, the state will be free to implement its extension of the disadvantaged business set-aside program.

**D. Jurisdiction over State Law Claims**

In their amended complaint, plaintiffs contend that the Wisconsin's administration of the disadvantaged business enterprise program in the 1987 Surface Transportation Act violates Wisconsin's competitive business statute (Wis.Stat. § 84.06(2)), Wisconsin's anti-discrimination statute (Wis. Stat. § 15.04) and Art. I, § 1 of the Wisconsin Constitution. Plaintiffs concede that "in the typical situation" the Eleventh Amendment prohibits federal courts from requiring state officials to conform their conduct to state law. *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 106, 104 S.Ct. 900, 911, 79 L.Ed.2d 67 (1984). In *Pennhurst,* the Supreme Court traced the history of states' Eleventh Amendment immunity from suit in federal court. It acknowledged that the doctrine in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), allowing state officials to be sued in federal court for violations of federal law, was a legal fiction designed to accommodate both the need to promote the supremacy of federal rights and the constitutional immunity of the states. *Pennhurst,* 465 U.S. at 105, 104 S.Ct. at 910–11. The Court went on to recognize that "[t]his need to reconcile competing interests is wholly absent ... when a plaintiff alleges that a state official has violated *state* law." *Id.* at 106, 104 S.Ct. at 911 (emphasis in original). Justice Powell noted, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to

state law." *Id.* Therefore, he concluded, the *Ex parte Young* doctrine is inapplicable to pendent state law claims against state officials. *Id.*

Plaintiffs argue that this is not a typical *Pennhurst* situation because federal administrative regulations expressly incorporate restrictions based on contrary state law provisions. Federal regulations permit recipients to seek waivers from the 10% goal based on "[l]egal barriers ... impeding the participation of disadvantaged businesses at at least a ten percent level," 49 C.F.R. § 23.65(d); and permit set-aside programs "[w]here not prohibited by state or local law." 49 C.F.R. § 23.45(k).

██ Although this case does not involve pendent state claims, the basic theoretical framework of *Pennhurst* still applies. Wisconsin state law is the source of the rights plaintiffs seek to vindicate. The fact that federal regulations permit defendants to assert state law limitations on their actions through the federal administrative process does not convert the state law claims into federal rights. Here, as in *Pennhurst,* there is no need to accommodate federal rights to a state's immunity from suit in federal court. It is not the place of this court to rule on the scope of Wisconsin's constitutional guarantee of equal protection or to harmonize the disadvantaged business set-aside program with other state-created statutory protections. Therefore, I decline to exercise jurisdiction over plaintiffs' claims based on violations of Wisconsin's competitive bidding law, anti-discrimination law and the Wisconsin Constitution.

**ORDER**

IT IS ORDERED that plaintiffs' motion for summary judgment is GRANTED in part and DENIED in part; defendants' motion for summary judgment is also GRANTED in part and DENIED in part; and this case is DISMISSED with prejudice.

FURTHER IT IS ORDERED that defendants are enjoined permanently from implementing the following aspects of their dis-

advantaged business enterprise preferences:

(1) The setting of goals for disadvantaged business subcontractor participation on exclusively state funded projects;

(2) The provision in Wis.Stat. § 84.076(3)(b) setting goals for disadvantaged business subcontractor participation on projects let to disadvantaged prime contractors under the state's set-aside program;

(3) Any goals for disadvantaged business subcontractor participation on individual projects or any set-asides under Wis.Stat. § 84.076 past the date that the disadvantaged business enterprise program in the Surface Transportation Uniform Relocation and Assistance Act of 1987 is authorized.