922 F.2d 419
 57 Empl. Prac. Dec. P 41,072, 59 USLW 2442,
36 Cont.Cas.Fed. (CCH) 76,003
 MILWAUKEE COUNTY PAVERS ASSOCIATION, et al.,
Plaintiffs-Appellants-Cross-Appellees,
v.
Ronald R. FIEDLER, individually and in his capacity as
Secretary of the Wisconsin Department of Transportation, and
David Manning, individually and in his capacity as the
Department's Minority Business Programs Director,
Defendants-Appellees-Cross-Appellants.
 Nos. 90-1747, 90-1793.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 4, 1990.
Decided Jan. 15, 1991.
 
 Philip Bradbury, Joseph Melli, John R. Sweeny, Melli, Walker, Pease & Ruhly, Madison, Wis., for plaintiffs-appellees.
 Charles D. Hoornstra, Asst. Atty. Gen., Office of the Atty. Gen., Wisconsin Dept. of Justice, Bradley C. Williamson, Lafollette & Sinykin, Madison, Wis., for defendants-appellants.
 Before POSNER and FLAUM, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.
 POSNER, Circuit Judge.
 
 
 1
 An association of highway contractors in Wisconsin brought suit to enjoin, as a form of affirmative action or reverse discrimination that violates the equal protection clause of the Fourteenth Amendment, programs by which the State of Wisconsin sets aside certain highway contracts for firms that are certified as "disadvantaged business enterprises" and also requires highway contractors to give preferential treatment to subcontractors that are so certified. The reason the latter as well as former feature of the programs harms the contractors is that it both requires them to award some subcontracts to contractors that are not the low bidders and (like the prime set-aside program) limits their own ability to compete for subcontracts. The programs are of two basic types, which the district judge treated differently in her opinion. 731 F.Supp. 1395 (W.D.Wis.1990). In the first type of program the state is the principal, rather than an agent of federal highway authorities, because the state receives no money from the federal government; this the judge enjoined, on the authority of City of Richmond v. J.A. Croson Co., 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), and the state appeals. In the second type of program the state is the administrator and disbursing agent of federal highway grants; this the judge refused to enjoin, on the authority of Fullilove v. Klutznick, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), and the association appeals.
 
 
 2
 Croson holds that the equal protection clause forbids states and municipalities to discriminate in favor of blacks and other minorities unless the discrimination is necessary to rectify discrimination against the favored groups. Wisconsin has made no effort to show that its program (for we are speaking now of the program that the district judge enjoined) is remedial in that or any other sense. But it argues that Croson does not govern here because the discrimination is not racial in character, the favored class being defined not as minority business enterprises but as disadvantaged business enterprises. "Disadvantaged" means excluded from the mainstream of American economic life, and the agency of exclusion need not be discrimination. An Appalachian white male might be disadvantaged in the relevant sense.
 
 
 3
 All this is fine but ignores the fact that the state presumes a black, but not an Appalachian or any other sort of white male, to be disadvantaged. The presumption is, it is true, rebuttable. But it seems to us (we can find no decision on the point, save another district court decision which relies heavily on Chief Judge Crabb's opinion in this case, Contractors Ass'n v. City of Philadelphia, 735 F.Supp. 1274, 1292-1307 (E.D.Pa.1990)) that a racial presumption is a form of racial discrimination, as would be obvious if the state had a rebuttable presumption that black subcontractors ought not to be permitted to work on state highway projects. And a majority of the Justices of the Supreme Court believe that racial discrimination in any form, including reverse discrimination, is unconstitutional when done by states or municipalities, unless the purpose is to provide a remedy for discrimination against the favored group. City of Richmond v. J.A. Croson Co., supra, 109 S.Ct. at 721 (plurality opinion), 735 (concurring opinion).
 
 
 4
 To trigger the presumption of disadvantage in the Wisconsin state programs, a subcontractor need only establish that 51 percent of its owners fall into one of four racial-ethnic groups (black, Hispanic, Asian, American Indian) or is a woman. Anyone who is not a member of one of these groups must prove that he is socially and economically disadvantaged in fact. The presumption can be rebutted, but given the difficulty of establishing whether a particular individual is socially and economically disadvantaged the availability of the presumption is likely to be decisive. This means that the state is conferring a significant benefit--access to a presumption of social and economic disadvantage that is the key to valuable entitlements--on grounds that Croson forbids a state to use without establishing that the purpose is to rectify invidious discrimination. The state can if it wants redistribute wealth in favor of the disadvantaged, but it cannot get out from under Croson by pronouncing entire racial and ethnic groups to be disadvantaged. The whole point of Croson is that disadvantage, diversity, or other grounds for favoring minorities will not justify governmental racial discrimination other than by the federal government; only a purpose of remedying discrimination against minorities will do so.
 
 
 5
 There is a possible exception. Croson is about favoritism toward racial and ethnic groups, not about favoritism toward women. The Supreme Court does not consider discrimination against women to be as invidious--as harmful and as difficult to justify--as discrimination against blacks or other racial minorities; nor, to come to the point, does it consider discrimination against men to be as invidious as racial discrimination. Craig v. Boren, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). (In treating sex discrimination less severely than racial discrimination, the Court is following a distinction in Title VII of the Civil Rights Act of 1964, which establishes a defense of bona fide occupational qualification for sex discrimination but denies it for racial discrimination. 42 U.S.C. Sec. 2000e-2(e)(1).) So maybe the state's program, insofar as it favors women, is not controlled by Croson. The state has waived the argument, however, by failing to make it, and by its silence has thus conceded that Croson applies to affirmative action in favor of women just as it does to affirmative action in favor of blacks and other racial and ethnic minorities. We need not decide whether this was a prudent concession. On the one hand it can be argued that if discrimination against women is not so invidious as discrimination against blacks, the case for using discrimination to remedy past wrongs is less urgent; the past wrongs were less severe, less harmful. On the other hand it can be argued that if sex discrimination is not so serious a wrong as racial discrimination we need not worry about confining its use to the remedial setting.
 
 
 6
 In neither Kahn v. Shevin, 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974), nor Orr v. Orr, 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979), both involving state laws discriminating against men, did the Supreme Court insist that the law be shown to be remedial within the meaning of Croson. But of course those decisions predate Croson. What vitality they retain is an issue we shall leave to a case in which the issue is preserved for appeal.
 
 
 7
 The basic question raised by the contractors' appeal is the proper characterization of the state's role under section 106(c) of the Surface Transportation and Uniform Relocation Assistance Act of 1987, P.L. 100-17, 101 Stat. 132, 145. The Act offers the states financial assistance with highway construction. Of course this assistance comes with strings attached. Section 106(c)(1) requires that 10 percent of the amounts appropriated under the Act "be expended with small business concerns owned and controlled by socially and economically disadvantaged individuals." Regulations issued by the federal Department of Transportation to implement this provision establish the very definitions and procedures discussed above in connection with the state program, 49 C.F.R. pt. 23, subpt. D--for that program piggybacks on the definitions and procedures in the federal regulations. The regulations also establish criteria and procedures by which a state can seek an exemption from the 10 percent minimum set aside for disadvantaged enterprises. 49 C.F.R. Secs. 23.64(e), 23.65. The receipt of funds under the federal Act is voluntary, but a state that decides to receive such funds is bound by the regulations. 49 C.F.R. Sec. 23.63. Oddly, the regulations fail to mention women as one of the groups eligible for the presumption of disadvantage. 49 C.F.R. Sec. 23.62. That is because the regulations date from a 1983 highway construction law and women were first made beneficiaries in the 1987 version, the one in issue here. The regulations were amended to include women, 49 C.F.R. pt. 23, subpt. D, App. A, Section-by-Section Analysis: Section 23.62 Definitions, but amended clumsily, so that the intention to entitle women to the presumption remains obscure as a matter of semantics. But everyone, including the district judge, 731 F.Supp. at 1401, has assumed that they are entitled to it; we shall assume so as well.
 
 
 8
 The program the contractors are challenging is similar to the one upheld in the Fullilove case. That too was a program of construction grants to the states (but for public works generally, rather than just for highway construction) containing a 10 percent set aside for minority (rather than for disadvantaged) business enterprises. The Supreme Court held that the program was constitutional "on its face." This meant that the statute might be applied in a constitutional way and hence should not be condemned in advance, but left open the possibility that it might be condemned later because of the way in which it was administered in fact. Our contractors do not question the continuing authority of Fullilove, the validity of the set-aside provision (section 106(c)(1)) in the Surface Transportation Act, or the validity of the federal regulations that implement that provision. They challenge the Act neither on its face nor as applied. But they argue that Croson prevents the state from playing the role envisaged for it by the Act and regulations unless the state is able to show that the set-aside program, as implemented in Wisconsin, is necessary to rectify invidious discrimination. Having made no such showing, the state should (the contractors argue) have refused to apply for funds under the Act, should if it did apply and receive such funds have sought an exemption from the 10 percent set-aside requirement, and rather than presuming social and economic disadvantage from membership in a class defined by reference to race, gender, or ethnicity should have insisted on proof of actual disadvantage by each firm seeking certification as a disadvantaged business enterprise.
 
 
 9
 These arguments, whatever merit they have or lack as an original matter, are inconsistent with the contractors' decision not to challenge the validity of the federal statute or regulations. Insofar as the state is merely complying with federal law it is acting as the agent of the federal government and is no more subject to being enjoined on equal protection grounds than the federal civil servants who drafted the regulations. The statute contemplates that states which decide to accept funds under it will reserve a portion of those funds for a class of disadvantaged contractors that, by virtue of a presumption created by regulations conceded to be valid, are likely to consist for the most part of enterprises controlled by members of the favored groups. If the state does exactly what the statute expects it to do, and the statute is conceded for purposes of the litigation to be constitutional, we do not see how the state can be thought to have violated the Constitution.
 
 
 10
 It is true that the statute does not require the states to accept funds under it and, by doing so, to become subject to the set-aside provision and the implementing regulations. But it authorizes them to do so, and action pursuant to a valid authorization is valid. The joint lesson of Fullilove and Croson is that the federal government can, by virtue of the enforcement clause of the Fourteenth Amendment, engage in affirmative action with a freer hand than states and municipalities can do. And one way it can do that is by authorizing states to do things that they could not do without federal authorization. That was Fullilove; it is this case as well.
 
 
 11
 There is an analogy to the power of Congress to lift the bar of the "dormant" or "negative" commerce clause. The quoted words refer to the interpretation of the commerce clause (Art. I, Sec. 8, cl. 3) as, by its own force, without any need for congressional action, forbidding the states to interfere unduly with interstate commerce. If Congress wants, it can authorize states to engage in activities that but for the authorization would violate the dormant commerce clause. Western & Southern Life Ins. Co. v. State Board of Equalization, 451 U.S. 648, 652-53, 101 S.Ct. 2070, 2074-75, 68 L.Ed.2d 514 (1981); Northeast Bancorp. v. Board of Governors, 472 U.S. 159, 174, 105 S.Ct. 2545, 2553-54, 86 L.Ed.2d 112 (1985). Why then cannot Congress use its powers under section 5 of the Fourteenth Amendment to authorize states to engage in activities that would otherwise violate section 1 of the amendment by virtue of Croson? See generally Cohen, Congressional Power to Validate Unconstitutional State Laws: A Forgotten Solution to an Old Enigma, 35 Stan.L.Rev. 387 (1983).
 
 
 12
 The answer may be that the commerce clause and section 5 of the Fourteenth Amendment are worded differently. The commerce clause authorizes Congress to regulate commerce; section 5 authorizes Congress to "enforce" the provisions of the amendment. It is difficult to see how authorizing a state to violate the amendment could be thought a means of enforcing the amendment. Mississippi University for Women v. Hogan, 458 U.S. 718, 732, 102 S.Ct. 3331, 3340, 73 L.Ed.2d 1090 (1982). But the paradox is superficial. Often the federal government by hook or crook "enlist[s] a branch of state government ... to further federal ends." FERC v. Mississippi, 456 U.S. 742, 762, 102 S.Ct. 2126, 2139, 72 L.Ed.2d 532 (1982). Here it has enlisted states as its agents to help administer a program conceded to be within the scope of section 5. To disallow the states from playing this role would merely hamstring the federal program.
 
 
 13
 The contractors point out that the remedial objective which persuaded the Supreme Court to uphold the set-aside program challenged in the Fullilove case may be a fiction when it is applied to a liberal northern state with a relatively small minority population, such as Wisconsin, that does not even attempt to ascertain the existence of a legacy of discrimination that might justify favored treatment for highway construction firms owned by blacks, or Hispanics, or American Indians, or Asians, or women. But this is just to argue that set-aside programs such as this, upheld on their face in Fullilove, are, as administered, the practice of cynical racial or interest-group politics. Maybe so. If so, the program violates the Constitution. But the plaintiffs are not challenging the set-aside program, a creature of federal statute and federal regulations. They are challenging the state's role in the program. Insofar as the state is merely doing what the statute and regulations envisage and permit, the attack on the state is an impermissible collateral attack on the statute and regulations. We add that the federal regulations explicitly permit the state or other entity receiving the grant to apply the presumption without investigating the situation of particular applicants. "[T]he basic meaning of a presumption of social and economic disadvantage is that the recipient assumes that a member of the designated groups is socially and economically disadvantaged. In making certification decisions, the recipient relies on this presumption, and does not investigate the social and economic status of individuals who fall into one of the presumptive groups." 49 C.F.R. pt. 23, subpt. D, App. A, Section 23.69 Challenge Procedure (emphasis in original).
 
 
 14
 Of course if the state exceeded its federal authority, it would be vulnerable to challenge under Croson--it is vulnerable to such challenge, as we have seen, insofar as it took the presumption in the federal regulations and applied it to programs not funded under and therefore not governed by the federal statute. Chief Judge Crabb found that the state exceeded its authority under the federal statute in two other minor ways as well, and enjoined those violations. We agree with her action and for the reasons she gave. 731 F.Supp. at 1413-15. The state would be further vulnerable if it made the racial presumption in the regulations irrebuttable, for that would be going beyond the authorization in the federal program. It has not done so.
 
 
 15
 However, the contractors also complain about the state's administration of the presumption, and that is precisely the sort of complaint that Fullilove allows. They note that only two members of a favored minority group have been held not to be socially and economically disadvantaged--two wealthy black football players. But the contractors acknowledge that they have made no effort to present, in proceedings for the certification of disadvantaged business enterprises, evidence rebutting the presumption accorded the members of the favored groups. They say that it is too big a burden to ask them to bear; that the state should make a fuller investigation of the applicants for certification. But again the contractors are quarreling with a regulation whose validity they have conceded. For in explaining that the racial presumption is rebuttable, the federal regulation states: "This"--the regulation is referring to the proposition that the presumption is rebuttable--"means that, as part of a challenge to the eligibility of a firm ..., a third party may present evidence that the firm's owners are not truly socially and/or economically disadvantaged, even though they are members of one of the presumptive groups." 49 C.F.R. pt. 23, subpt. D, App. C. The regulation establishes the procedure that the plaintiffs, inconsistently, challenge while conceding its validity.
 
 
 16
 AFFIRMED.