**O'DONNELL CONSTRUCTION CO., Plaintiff,**

v.

**DISTRICT OF COLUMBIA, et al., Defendants.**

Civ. A. No. 89–1867.

United States District Court, District of Columbia.

March 14, 1991.

Robert Carl Smith, Washington, D.C., for plaintiff.

William W. Nooter, Washington, D.C., for defendants.

## MEMORANDUM ORDER

JOHN GARRETT PENN, District Judge.

Plaintiff O'Donnell Construction Company ("O'Donnell") has filed the instant lawsuit seeking declaratory and injunctive relief declaring as unconstitutional two set-aside programs, namely the District of Columbia Minority Contracting Act (hereinafter the "Act"), D.C.Code section 1–1141 *et seq.* (1981), and the Department of Public Works' ("DPW") Disadvantaged Business Enterprise ("DBE") Program[1], that govern defendant District of Columbia's procedures for awarding construction contracts. O'Donnell also claims that these programs violate its civil rights under 42 U.S.C. section 1981[2] and 42 U.S.C. section 1983.[3]

This case is presently before the Court on O'Donnell's *Motion for a Preliminary Injunction.* O'Donnell seeks an order enjoining the District from using or enforcing race-based quotas and set-asides in the awarding of road construction contracts and subcontracts. After careful consideration of the motion, the opposition thereto and the entire record in this case, the Court concludes that O'Donnell's motion for a preliminary injunction should be denied for the reasons set forth below.

## I. Background

O'Donnell is a Virginia corporation with its principal place of business in the District of Columbia. Arnold J. and John O'Donnell each own 50% of the company's stock. They are white males. The company, which was founded in 1985, is engaged in the road construction business in the Washington metropolitan area. According to Arnold J. O'Donnell, the majority of the firm's work is performed for government agencies, rather than the private sector. *See* Affidavit of Arnold J. O'Donnell, paras. 2–5. The company, however, has bid on only one DPW road construction contract in the last four fiscal years. *See* Affidavit of Jerry M. Carter dated February 7, 1991 at para. 7.

## II. The Statutory and Regulatory Scheme

### A. *District of Columbia Minority Contracting Act*

#### 1. Set–Aside Program

The District of Columbia Minority Contracting Act was enacted in March, 1977. The Act establishes goals for the participation of minority business enterprises (hereinafter "MBE") in the awarding of public construction contracts. As stated in the Act's findings, one of its goals is "to achieve the goal of equal opportunity, to overcome the effects of past discrimination in the allocation of contracts, and the financing and bonding of minority business enterprises." D.C.Code section 1–1141(6). Among the stated reasons for the Act is the fact that "[a] persistent pattern of racial discrimination in our society has prevented minority business enterprises from gaining a fair share of contracts and subcontracts for construction, supplies, and materials in both the public and private sector ..." Section 1–1141(1). Additionally, the Act states that "[t]he inability of [MBEs] to prosper and participate fully is particulary unacceptable in the District of

---

**1.** *See* Complaint, Exhibit A.

**2.** 42 U.S.C. section 1981 provides in relevant part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white persons...."

**3.** 42 U.S.C. section 1983 provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the *District of Columbia,* subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ..."

Columbia, where there is a great disparity between the number of [MBEs] operating in the community and the number of such enterprises participating in public contracting ..." Section 1–1141(2).

The Act provides that each agency, department, office, or instrumentality of the District of Columbia government shall "[a]llocate its construction contracts in order to reach the goal of 35 percent ... of the dollar volume of all construction contracts to be let to local [MBEs] ..." *Id.* at sections 1–1142(6), 1–1146(a)(1).[4] The Act defines MBE as "a business enterprise of which more than 50 percent of the ownership and control is held by individuals who are members of a minority, and of which more than 50 percent of the net profit or loss accrues to members of a minority." *Id.* at section 1–1142(2). Further, under the Act, "the term 'minority' means Black Americans, Native Americans, Asian Americans, Pacific Islander Americans, and Hispanic Americans, who by virtue of being members of the foregoing groups, are economically and socially disadvantaged because of historical discrimination practiced against these groups by institutions within the United States of America." *Id.* at section 1–1142(1). Additionally, a "local" MBE is defined as a MBE "with its principal office physically located in the District of Columbia, and which is licensed pursuant to [section] 47–2801 et seq. or subject to the tax levied under [section] 47–1810.1 et seq." Section 1–1142(3). Finally, section 1–1148(a) of the Act requires that all firms participating in the program be issued a certificate of registration.

The Act also created a Minority Business Opportunity Commission ("Commission") to help implement, monitor and enforce its goals. Among other things, the Commission is responsible for determining whether firms desiring to take advantage of the Act are bona fide MBEs or joint ventures and are eligible for certification; determining, pursuant to applicable regulations, whether a MBE without a principal office physically located in the District of Columbia is never-

theless a local business enterprise; reviewing agency procurement plans; considering agency requests for adjustment of goals in particular instances; and authorizing agencies to refuse to let a contract where it determines that the bids are excessive. Sections 1–1149(2), (4), (8), 1–1149(13). In order to achieve the purposes of the Act, the Commission may also recommend that an agency waive bonding in excess of the standard waiver, make advance payments to a certified contractor, or subdivide a contract into smaller parts. Section 1–1149(6), (7). Finally, the Commission is required to submit a report to the Mayor and the Council every 6 months reviewing the performance of agencies in meeting the established goals. Section 1–1145.

The Commission is also required under the Act to design programs to assist local minority contractors. Among these programs is the "sheltered market", defined as a "process whereby contracts or subcontracts are designated, before solicitation of bids, for limited competition from [MBEs] on either a negotiated or competitive bid process." Sections 1–1142(7), 1–1147(b). Further, all prime contractors who subcontract are required to award at least 50% of their subcontracts to certified MBEs. Section 1–1147(c), (d). This requirement, however, may be waived by the contracting official, with the Commission's approval and consent. *Id.*

### 2. Legislative History

As Law 1–95, the Act was first introduced in the District of Columbia City Council and assigned Bill No. 1–323, which was referred to the Committee on Employment and Economic Development (hereinafter the "Committee"). The Bill was adopted on first and second readings on September 15, 1976 and on October 12, 1976 respectively. It was signed by the Mayor on November 12, 1976 after which it was assigned Act No. 1–174 and transmitted to both Houses of Congress for its review. After the 30 day review period, it

**4.** The Act as originally passed in 1976 established a goal of 25%. The 1983 amendment to the Act set the present goal of 35%.

became law. *See* D.C.Code section 1–1141 (reference to legislative history of Law 1–95).

The Committee, chaired by Councilmember James E. Coates, held joint public hearings on May 28–29, 1975 with the Committee on Government Operations and the Committee on Public Services and Consumer Affairs. During the hearings, the Committee received detailed testimony and voluminous data from governmental and industrial representatives, including Committee members and staff, federal agencies, finance and bonding industries, minority organizations, minority contractors, and non-minority and large contracting firm representatives.[5] In 1976, the Committee prepared a 53–page report which discussed all aspects of the proposed legislation and recommended its enactment (hereinafter the "Report"). *See* Defendants' Motion to Dismiss the Complaint or, in the Alternative, for Summary Judgment, Exhibit 1. The Committee's legislative findings of racial discrimination in the construction industry are summarized below.

First, the Committee relied on several varieties of statistical evidence. It noted a wide disparity between the District's minority population of seventy-six percent and the percentage of minority participation in public contracting with the District. *See* Report at 8. Moreover, statistical comparisons were made by the Committee between minority capability and minority participation in the local construction industry. The Report points out that in 1974, 82 Washington, D.C. area MBEs had generated revenues of $52 million and thus were capable of performing 34% of the District's construction work, which totalled $153 million. The Report further demonstrates, in reliance on surety bond rating procedures, that MBEs possessed a capability to perform $102 million worth of construction work, or 68.3% of the construction contracts let. On the other hand, only 3.4% of the District's construction work had actually been awarded to minority firms. *Id.* at 8–10. Similar statistics were provided with

respect to service, supply, and architectural contracts. *Id.* at 11–12.

Second, the Committee cited a Congressional report in support of the MBE program. Specifically, in House Report 94–468, the chairman of the Subcommittee on SBA Oversight and Minority Enterprise expressed the view that effective remedial action was needed to guarantee equal economic opportunity for those who have traditionally encountered impediments to their business development because of discrimination. *Id.* at 36.

Third, at the legislative hearings a number of minority contractors offered testimony concerning discrimination in the local construction industry. Among the issues brought to the attention of the Committee were discriminatory practices by non-minority firms in the award of subcontracts to minority firms, discriminatory practices by lending institutions towards minorities, the discriminatory effects of bonding requirements and attempts by non-minority firms to evade existing affirmative action programs. The witnesses provided numerous specific examples to the Committee of these facts.

For example, Milton G. Carey, president of Mars General Corporation, a minority general contracting firm, testified at the hearings concerning specific incidents he had personally experienced in which major white contractors had been able to avoid their obligations under existing affirmative action programs by imposing unreasonable demands on minority subcontractors such as him, and then obtaining waivers of the affirmative action requirements. These companies could then obtain lower bids from non-minority subcontractors, only later to raise the price through change orders. *See* Def.'s Opp., Ex. 1, pp. 16–18.

Similarly, in the statement of Frank C. Kent, Executive Director of the Minority Contractors Resource Center, Inc., there was a lengthy discussion of the difficulties minority firms faced getting non-minority

---

**5.** For excerpts of the hearing testimony, see Defendants' Opposition to Plaintiff's Application

for a Preliminary Injunction, Exhibits 1–4.

firms to hire them for Metro work until they were forced to meet specific affirmative action requirements. Even then, non-minority firms tried to circumvent the requirements by setting up phony minority companies. *Id.* at 72–77. Additional testimony of a similar nature was related in the statement of Joseph D. Jackson, Director of the Washington Council for Equal Business Opportunity. *See* Def.'s Opp., Ex. 3, p. 9.

Discrimination by lending institutions against minority firms was reported by Joe Willis of Alpha Omega Construction Company, a minority firm. *Id.* at 25–28. Mr. Douglas Edwards, of E & S Hauling, Inc., also spoke about the disparate treatment he received from non-minority firms in the bidding process. According to Mr. Edwards, non-minority general contractors usually required that his firm submit a written quotation and, subsequently, he is not allowed an opportunity to negotiate the price. By contrast, these same general contractors permit non-minority subcontractors to phone in their bid and allow them to negotiate the price afterward. *Id.* at 40–41.

The special problems minority firms face with respect to bonding requirements were described at some length by Mitchell Hairston, of District Builders Incorporated. Mr. Hairston pointed out that he had been told by bond companies that black contractors are a high risk. *See* Def.'s Opp., Ex. 1, p. 59. Similar problems facing a minority street paving company were testified to by Carl Jones of Jones & Artis Construction Co. *See* Def.'s Opp., Ex. 3, p. 20. Finally, Charles Cassell, Executive Director of the D.C. Council of Black Architects, articulated with great specificity the plight of the minority contractor in this jurisdiction as a result of the pervading influence of discrimination. *See* Def.'s Opp., Ex. 4, pp. 37–40.

In addition to testimony regarding discrimination in the local construction industry, the Committee heard testimony con-cerning other impediments facing minority contractors. These include difficulty in obtaining financing, difficulty in obtaining bonding, difficulty in bidding on large parcels, difficulty in receiving timely bid announcements, difficulty in receiving timely payment, difficulty in maintaining start-up capital for new projects, difficulty in securing meaningful equity positions in join ventures and difficulty in obtaining contracts from the District of Columbia. *See* Report at 14–16.

### B. *Disadvantaged Business Enterprise Program*

In 1983, Congress enacted a quadrennial transportation authorization act entitled the Surface Transportation Assistance Act of 1982, Pub.L. No. 97–424, 96 Stat. 2097, 2100. The 1982 Act requires that each recipient of federal aid make reasonable efforts to award at least 10% of these funds to disadvantaged firms, that is, small firms owned and controlled by socially and economically disadvantaged individuals. The Department of Transportation promulgated detailed regulations implementing this section. 48 Fed.Reg. 33432 *et seq.*, codified at 49 C.F.R. part 23, subpart D (1986). The subsequent authorization act, the Surface Transportation and Uniform Relocation Assistance Act of 1987 ("STU-RAA"), contained a similar provision. Pub.L. 100–17, section 106(c), 101 Stat. 132, 145. STURAA contained language essentially identical to the 1982 Act in that it also established a 10% goal for expenditures with disadvantaged businesses. In 1987, the Department of Transportation promulgated amendments to the regulations required by STURAA. 52 Fed.Reg. 39225–31. The current regulations are codified at 49 C.F.R. part 23 (1990).[6]

As a condition of receiving federal funding of state highway construction projects, the District must comply with federal rules regarding contracting generally, and regarding STURAA in particular. States may certify as DBEs only those businesses

---

**6.** In *Milwaukee County Pavers Ass'n v. Fiedler,* 731 F.Supp. 1395 (W.D.Wis.1990), *aff'd,* 922 F.2d 419 (7th Cir.1991), Chief Judge Crabb co-gently summarized the regulations implementing STURAA. The following discussion of these regulations is extracted therefrom.

that meet the eligibility standards in 49 C.F.R. section 23.62. Under 49 C.F.R. section 23.62, a firm is disadvantaged if it is a small business concern and is owned and controlled by individuals who are socially and economically disadvantaged. STURAA incorporated the definitions of social[7] and economic[8] disadvantage of section 2[8] of the Small Business Act, 15 U.S.C. section 637(d), and the regulations promulgated pursuant to it. States are directed to make a rebuttable presumption that women and members of specified racial and ethnic minority groups[9] are socially and economically disadvantaged and to determine on a case-by-case basis whether individuals who are not members of those groups are socially and economically disadvantaged. Also, as part of its certification procedure, the state must provide a procedure through which third parties may challenge the certification of individuals presumed to be socially and economically disadvantaged. 49 C.F.R. section 23.69.

Recipients of federal highway assistance must set overall goals for participation by DBEs that are "practical and related to the availability of [DBEs] in desired areas of expertise." 49 C.F.R. section 23.45(g). Any overall goal of less than 10% must be justified with information concerning, among other things, the recipient's efforts to locate disadvantaged businesses, the recipient's efforts to make disadvantaged businesses aware of contracting opportunities, the availability of disadvantaged businesses, the size and other characteristics of the minority population in the recipient's jurisdiction, and legal or other barriers impeding the participation of disadvantaged businesses at a 10% level and the recipient's efforts to overcome or mitigate the effects of these barriers. 49 C.F.R. section 23.65.

One way that a state may achieve its overall goal is by setting individual goals for disadvantaged business subcontractor participation on each prime contract. 49 C.F.R. section 23.45(g)(2)(ii). Like the overall disadvantaged business participation goals, specific project goals must be "practical and related to the availability of [disadvantaged businesses] in desired areas of expertise." 49 C.F.R. 23.45(g)(1). Specific project goals must be based on "known availability of qualified [DBEs]." 49 C.F.R. section 23.45(g)(7).

For all contracts on which disadvantaged business subcontractor participation goals have been established, the apparently successful prime contractor must submit information about the participation of disadvantaged firms before the state commits itself to the performance by the prime contractor. 49 C.F.R. section 23.45(h)(1). If the level of disadvantaged business participation does not meet the contract goals, the state may grant a waiver of the goals to the prime contractor if the state is satisfied that the prime contractor has made good faith efforts to meet the goals. 49 C.F.R. section 23.45(h)(2). Each state has discretion to consider whether, under all relevant circumstances, the contractor has "actively and aggressively" attempted to meet the goal. 49 C.F.R. section 23.45, Appendix A, at 176. The federal government has provided a non-exclusive, non-ex-

---

**7.** According to the regulations, social disadvantage "must stem from [an individual's] color; national origin; gender; physical handicap; long term residence in an environment isolated from the mainstream of American society; or other similar cause beyond the individual's control." 49 C.F.R. section 23, Appendix C, sections (A)–(B). Furthermore, the individual must show a personal experience of social disadvantage that is long-standing and has negatively influenced his or her advancement in business. *Id.*

**8.** Economic disadvantage is a secondary determination that may be made only after social disadvantage has been determined. *49 C.F.R.*

section 23, Appendix C, sections (A)–(B). The regulations state that "[a]s a general rule, economically disadvantaged individuals are socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities, as compared to others in the same or similar line of business and competitive market area who are not socially disadvantaged."

**9.** A minority group member is a Black, Hispanic, American Indian, Eskimo, Aleut, Native Hawaiian, Asian–American, or Asian–Pacific. The exact parameters of these racial and ethnic categories are defined at *49 C.F.R. section 23.62.*

haustive list of the kind of efforts that states may consider. *See* 49 C.F.R. section 23.45, Appendix A. It is "not intended to be a mandatory checklist." *Id.*

Pursuant to STURAA, in 1988 the District enacted the Department of Public Works ("DPW") Disadvantaged Business Program ("DBE"). The DBE program was approved by the Federal Highway Administration on November 29, 1988. DPW is primarily responsible for administering the program. Firms wishing to participate in this program must apply for certification as a DBE under the provisions set forth in the federal regulations.

Since 1988, DPW has set an overall goal of awarding 37% of federally-funded contracts to DBEs. With respect to individual contract goals, DPW has set a goal of 37% of the total dollar volume for DBE participation where the prime contract has subcontracting possibilities. In addition, the District has enacted the Sheltered Market option provided for in C.F.R. section 23.-45(k).

## III. Motion for Preliminary Injunction

### A. *Standing to Seek Injunctive Relief*

■ At the outset, defendants interpose a challenge on grounds of lack of standing to O'Donnell's ability to seek injunctive relief.[10]

The law of standing comprises a set of constitutional and prudential requirements. *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975). A three-prong test of standing has been attributed to the "case" or "controversy" requirement of Article III of the Constitution. "[A] litigant must show that he has suffered injury as a result of the defendant's putatively illegal conduct and that his injury both may be traced to the challenged conduct and is likely to be redressed by the judicial relief he seeks." *Nat. Maritime Union of America v. Commander, MSC*, 824 F.2d 1228, 1234 (D.C.Cir.1987) (*citing Valley Forge Christian College v. Americans United for Separation of Church &*

*State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982)). Once this threshold has been met, a variety of prudential limits may be imposed, including "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). In addition, the relief the litigant seeks is crucial to the determination of his standing; he may possess standing as to one form of relief but not as to another. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).

In *Lyons*, respondent Lyons sought injunctive relief against the Los Angeles Police Department barring the use of chokeholds except in certain limited circumstances. The Court concluded that although Lyons had standing to seek damages, he had not demonstrated an adequate basis for equitable relief because of the speculative nature of his claim of future injury. The Court emphasized that past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy. Rather, Lyons would have "to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part." *Id.* at 105, 103 S.Ct. at 1667. In addressing the standard for standing to seek prospective relief the Court stated: "The equitable remedy is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again—a 'likelihood of substantial and irreparable injury.'" *Id.* at 111, 103 S.Ct. at 1670. Thus, in order to obtain

---

10. Defendants' argument is limited to the question whether plaintiff has standing to seek the extraordinary remedy of a preliminary injunc-

tion. Defendants assert that at a later date a further motion may be filed challenging O'Donnell's standing to bring the instant lawsuit at all.

injunctive relief, a party must make a showing that they can reasonably expect to encounter the same or similar injury in the future. 13 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure section 3531.2 (1984). Defendants contend that O'Donnell lacks standing to seek injunctive relief because it cannot show that, due to defendants' actions, future harm is likely, substantial and immediate. The Court disagrees.

In the complaint, O'Donnell alleges that "it has been excluded from public contracting opportunities and has been injured in its business and property by reason of the racial discrimination practiced by the District of Columbia against non-minority firms." Complaint, para. 25. Further, O'Donnell contends that it is "ready, willing, and able" to perform construction work let by the District. Affidavit of Arnold J. O'Connor, para. 6. These allegations demonstrate that the injury complained of in this action constitutes the lost opportunity to bid on contracts which are reserved for the District's MBE program. But for the District's allegedly unconstitutional MBE plan, non-minority firms, such as O'Donnell, would be able to compete for all of the district's constructions projects rather than a specified percentage.

In *CACI, Inc.–Federal v. U.S.*, 719 F.2d 1567, 1572–75 (Fed.Cir.1983), the court held that a disappointed bidder had standing to challenge a government contract award, finding that the injury that confers standing is not loss of the contract but loss of "the opportunity to have its bid considered solely on its merits." *See also University of California v. Bakke*, 438 U.S. 265, 280 n. 14, 98 S.Ct. 2733, 2743 n. 14, 57 L.Ed.2d 750 (1978) (Injury was found "in the University's decision not to permit Bakke to compete for all 100 places in the [medical school] class, simply because of his race."); *West Va. Assn. of Community Health Centers v. Heckler*, 734 F.2d 1570, 1574–76 (D.C.Cir.1984) (party—which challenged the formula by which grants were allocated—has standing to seek relief that would allow them an opportunity to compete for funding); *Associated Gen. Contractors v. City of New Haven*, 130 F.R.D. 4, 7–8 (D.Conn.

1990) (holding that association of contractors and suppliers had standing to challenge set-aside program because denial of opportunity to compete for all contracts awarded was injury in fact); 13 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure section 3531.4 (1984) ("[L]oss of an opportunity may constitute injury, even though it is not certain that any benefit would have been realized if the opportunity had been accorded."). Undoubtedly, if the District continues to operate its MBE program, O'Donnell will face the risk of the same injury in the future because it will again be unable to bid on a portion of the District's construction contracts. Notably, *CACI, Inc.–Federal* and *West Va. Assn. of Community Health Centers* each involved claims for injunctive relief. For these reasons, the Court concludes that O'Donnell has alleged facts which, if true, would establish standing to seek injunctive relief within the meaning on *Lyons*.

### B. *Applicable Legal Standard*

■ O'Donnell seeks an order enjoining the District from using or enforcing race-based quotas and set-asides in the awarding of road construction contracts and subcontracts. O'Donnell, however, requests that the District be enjoined from using racial criteria only as to future bid solicitations. In order to be entitled to injunctive relief, the moving party must demonstrate that it is likely to prevail on the merits, that it will suffer irreparable injury absent the granting of injunctive relief, that the issuance of an injunction will not cause substantial harm to other persons interested in the proceedings, and that the issuance of an injunction is in the public interest, or in any event, is not adverse to the public interest. *See Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 182 U.S.App.D.C. 220, 222, 559 F.2d 841, 843 (1977). "The court is not required to find that ultimate success by the movant is a mathematical probability, and indeed, as in this case, may grant [an injunction] even though its own approach may be contrary to the movant's view of the merits. The necessary 'level' or 'de-

gree' of possibility of success will vary according to the court's assessment of the other factor." *Id.*

## C. Likelihood of Success on the Merits
### 1. District of Columbia Minority Contracting Act

■ The issue presented to the Court is whether O'Donnell is likely to succeed on its claim that the District's Minority Contracting Act should be struck down as an unconstitutional violation of the equal protection clause. First the Court must determine the appropriate standard of review to apply to the Act. O'Donnell correctly asserts that the standard of review articulated in *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), should apply.[11]

In *Croson*, the Court examined a Richmond, Virginia MBE plan which required prime contractors awarded city construction contracts to subcontract at least thirty percent of the dollar amount of each contract to an MBE. A plurality of the Court struck down the Richmond plan as violative of the equal protection clause. *Id.* at 511, 109 S.Ct. at 730.

■ A majority of the Court in *Croson* adopted strict scrutiny as the standard of judicial review for race-conscious remedial programs enacted by state and local legislatures.[12] *Id.* at 493, 109 S.Ct. at 721 (plurality opinion); *id.* at 520, 109 S.Ct. at 735

(Scalia, J., concurring in the judgment). In other words, courts must strictly scrutinize the use of racial classifications to determine whether the compelling interest relied upon by the government actually exists and suffices. Such measures may only be used by states and localities in situations in which the legislature can put forth "a prima facie case of a constitutional or statutory violation." *Id.* at 500, 109 S.Ct. at 724. Applying this heightened standard to the Richmond MBE plan, the Court found that the set-aside program (1) was not supported by adequate evidence of past discrimination to establish Richmond's compelling interest; and (2) was not tailored narrowly enough to its goal of remedying the effects of past discrimination. *Id.* at 498–508, 109 S.Ct. at 723–29.

The *Croson* Court did not, however, conclude that race-based set-aside programs violate the equal protection clause per se. In her opinion, Justice O'Connor stated: "Nothing we say today precludes a state or local entity from taking action to rectify the effects of identified discrimination within its jurisdiction.... In the extreme case, some form of narrowly tailored racial preference might be necessary to break down patterns of deliberate exclusion." *Id.* at 509, 109 S.Ct. at 729 (plurality opinion). A majority of the Court agreed with this statement. *See id.* at 519, 109 S.Ct. at 734 (Kennedy, J., concurring); *id.* at 528,

---

**11.** The Court rejects the defendants' argument that the Act should be assessed under the less rigorous test announced in *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980). In *Fullilove*, the Court upheld as constitutional a congressionally enacted minority set-aside program which authorized funding for public works projects. In upholding the program, the Court emphasized the unique remedial powers of Congress under section 5 of the Fourteenth Amendment. The *Fullilove* standard was not applied to the local program challenged in *Croson*. There, the Court stated: "It is fundamental that in no organ of government, state or federal, does there repose a more comprehensive remedial power than in the Congress, expressly charged by the Constitution with competence and authority to enforce equal protection guarantees. *Croson*, 488 U.S. at 488, 109 S.Ct. at 718 (*quoting Fullilove v. Klutznick*, 448 U.S. at 483, 100 S.Ct. at 2777 (plurality opinion)).

Contrary to defendants' assertions, the District does not enjoy the constitutional mandate to enforce the dictates of the Fourteenth Amendment as Congress does. This authority was not delegated to the District under the Self-Government Act. Nor is this authority bestowed on the District merely because of the District's status as a federally-created municipal corporation or due to congressional oversight of local legislation.

**12.** Although Justice O'Connor announced the judgment of the Court, a majority of the justices joined only in parts I, III–B, and IV of her opinion. Two justices joined in part II of Justice O'Connor's opinion, while three joined in parts III–A and V of that opinion. Two justices filed opinions concurring in parts of the opinion and concurring in the judgment. Three justices filed dissenting opinions.

109 S.Ct. at 739 *passim* (Marshall, J., dissenting). Thus, it's apparent that the constitutional right to equal protection and race conscious remedies can coexist in state and local legislation under certain, limited circumstances.

In its challenge, O'Donnell contends that the Act does not serve a compelling government interest, and even if it does it is not narrowly tailored on its face or in practice. The District, on the other hand, asserts that legislative history underlying the Act amply demonstrates that the purpose of the Act was to address past discrimination against MBEs, and that the program established is narrowly tailored to achieve that goal.

Although *Croson* declines to specify precisely what kind of evidentiary showing will suffice, it does point out the inadequacies in the Richmond program. In this regard, Richmond and the District Court had relied upon the following: (1) the ordinance's declaration that it was remedial; (2) statements by proponents of the legislation that there was discrimination in the construction industry; (3) statistical disparities between the number of minority businesses receiving prime contracts and the number of minorities in the general population; (4) the minuscule number of minority contractors in local and state contractors' associations; and (5) congressional findings that nationwide discrimination in the construction industry existed. *Id.* at 499–500, 109 S.Ct. at 723–24. The majority found that none of these considerations, singly or together, established a prima facie case of discrimination such that remedial legislation was warranted. *Id.*

Specifically, the *Croson* Court found the fact that the Plan declared itself to be "remedial" to be insufficient, since "the mere recitation of a 'benign' or legitimate purpose for a racial classification is entitled to little or not weight." *Id.* at 500, 109 S.Ct. at 724. Similarly, the views of Plan proponents as to past and present discrimination in the industry were found to be highly conclusory and of little probative value. *Id.* Moreover, the Court stated that "[r]eliance on the disparity between

the number of prime contracts awarded to minority firms and the [city's] minority population ... is ... misplaced[,]" *id.* at 501, 109 S.Ct. at 725, because special qualifications are required to fill particular jobs. Instead, when special qualifications are necessary, the proper statistical evaluation would compare the percentage of MBE's in the relevant market that are qualified to undertake city subcontracting work with the percentage of total city construction dollars that are presently awarded to minority subcontractors. *Id.* 501–502, 109 S.Ct. at 725. Additionally, the fact that MBE membership in local contractors' associations was extremely low was found by the Court not to be probative absent some link to the number of MBEs eligible for membership. *Id.* at 503, 109 S.Ct. at 726. "If the statistical disparity between eligible MBEs and MBE membership were great enough, an inference of discriminatory exclusion could arise." *Id.* The Court felt that there were "numerous explanations for [the] dearth of minority participation [in this area], including past societal discrimination in education and economic opportunities as well as both black and white career and entrepreneurial choices." *Id.* Finally, the Court held that the probative value of Congress' finding in connection with the set-aside approved in *Fullilove* that there had been nationwide discrimination in the construction industry was extremely limited, since, by including a waiver procedure in the national program, Congress explicitly recognized that the scope of the problem would vary from market area to market area. *Id.* at 504, 109 S.Ct. at 726. In any event, Congress was acting pursuant to its unique enforcement powers under section 5 of the Fourteenth Amendment. *Id.* at 504, 109 S.Ct. at 726–27. Thus, the Court found the factual predicate offered in support of the Richmond plan to be fatally defective.

To be upheld under the strict scrutiny test, not only must race-conscious remedies be enacted pursuant to a compelling state interest, they must also be narrowly tailored to affect that interest. With respect to the Richmond plan, the Court took issue with two aspects of the tailoring. First,

the Court noted that the Richmond City Council had not considered the use of race neutral means to increase minority business participation in city contracting as an alternative to a race-based quota. *Id.* at 507, 109 S.Ct. at 728. Second, the Court held that the 30% quota employed by Richmond was not narrowly tailored to any goal, "except perhaps outright racial balancing." *Id.* The figure "rest[ed] on the 'completely unrealistic' assumption that minorities will choose a particular trade in lockstep proportion to their representation in the local population." *Id.*

■ In this Court's view, the evidentiary basis relied upon by the District for the Act is much stronger and in stark contrast to that underpinning the Richmond plan. This is so although the record demonstrates that the Act possesses several of the characteristics fatal to the constitutionality of the Richmond plan. For example, the Act declares itself to be remedial. It also makes reference to societal discrimination. Additionally, the Committee relied on the disparity between the percentage of minority participation in public contracting with the District and the District's minority population of seventy-six percent. Finally, the Committee cited a Congressional report regarding discrimination in business in support of the MBE program. In *Croson*, the Court stated that these types of evidence were of little probative value in establishing a prima facie case of discrimination in the Richmond construction industry. Even if the foregoing evidence is rejected as insufficient, however, the Court believes that there is adequate evidence of the type deemed pertinent by the Supreme Court to justify the Act.

The *Croson* Court offered some guidance to lower courts to determine whether race-conscious remedial relief is justified. As mentioned above, state and local legislatures may take account of statistical disparities. "Where there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise." *Id.* at 509, 109 S.Ct. at 729. In the case at hand, the city council made statistical comparisons showing the disparity between minority capability and minority participation in the local construction industry. These statistics demonstrated that MBEs were capable of performing at least 34% of the District's construction work, but that only 3.4% of such work had actually been awarded to them. *See* Report at 8–12.[13] Such statistics indicate that the Act is materially different from the Richmond MBE plan. Unlike Richmond, the District implemented its MBE program based on statistics indicating a continuing practice of discrimination in the local construction industry. The statistics refute O'Donnell's claim that the Act is not remedial in nature.

"Moreover, evidence of a pattern of individual discriminatory acts can, if supported by appropriate statistical proof, lend support to a local government's determination that broader remedial relief is justified." *Id.* The defendants are correct in arguing that the District had before it some specific evidence of prior discrimination in the local construction industry. Having examined the entire record, it's clear that there are several portions of testimony documenting

**13.** O'Donnell quarrels with the statistics relied upon by the District. In O'Donnell's view, the statistics are not relevant because they comprise all areas of the construction industry. O'Donnell contends that distinct lines of business within the construction industry should be examined independently and treated separately. For example, O'Donnell contends that statistics for road construction contracts should not be lumped together with statistics for building construction contracts.

O'Donnell's interpretation would amount to an unsustainable expansion of the *Croson* ruling. The *Croson* opinion does not specifically address whether state and local legislatures must breakdown the various categories of construction work and establish a record of discriminatory exclusion within each such area. Rather, the *Croson* Court considered whether there was sufficient evidence of discrimination in the Richmond construction industry as a whole. Accordingly, this Court will adopt the analysis utilized by the Supreme Court and examine the construction industry at issue here as a whole.

incidents where identified minority business owners felt they had been excluded from contracting opportunities on the basis of race. As detailed above, the testimony of Milton C. Carey, Frank C. Kent, Joe Willis, Mitchell Hairston and others provided specific examples of their experiences to illustrate the discriminatory practices by non-minority firms in the award of subcontracts to minority firms, discriminatory practices by lending institutions towards minorities, the discriminatory effects of bonding requirements and attempts by non-minority firms to evade existing affirmative action programs. *See* Def.'s Opp., Ex. 1, pp. 16–18, 59, 72–77, Ex. 3, pp. 9, 20, 25–28, 40–41, Ex. 4, pp. 37–40. Much of this testimony appears to be precisely what the *Croson* Court required governments to consider in lawfully enacting a race-conscious set-aside program. In any event, the quantum of proof of identified discrimination offered in this testimony certainly exceeds that put forth by the proponents of the Richmond plan.

In short, the District has satisfactorily presented relevant evidence of statistical disparities and discriminatory acts to justify its race conscious measures.

■ In addition, the Court must assess whether the Act is narrowly tailored to remedy prior discrimination. The Act differs from the Richmond plan in several respects. First, unlike in *Croson*, the District justified its MBE plan by relying on discriminatory, as well as race-neutral, barriers to minority participation in the local construction industry. Further, the Act included in the law many of the race-neutral measures suggested in *Croson*.[14] The Re-

port reveals that the Committee considered whether these alternative remedies might, in themselves, serve the purposes of the Act and decided that they would not.

The Court is also of the view that the 35% goal is designed to combat an identified injury. The District presented a satisfactory explanation for its choice of a 35% set-aside goal. The Committee Report indicates that initially a goal of 50% was suggested, but was rejected because it was not feasible for minority prime contractors to operate at this capability rate. Report at 25. The Committee ultimately arrived at the more realistic 25% figure because, in their view, it was "a reasonable percentage that would be more readily attainable and more easily supportable by current statistical data." *Id.* at 25–26. Subsequently, the Act was amended to provide for a set-aside goal of 35%. Even this increased figure is related to the percentage the Committee determined that minority contractors were capable of performing. Thus, it can be said that the District has presented a satisfactory explanation for its choice of a 35% set-aside goal because there is a nexus between the scope of the injury and the remedial figure. Consequently, it does not appear that the Act is burdened by the same sort of egregious tailoring problems the Court noted in the Richmond plan.[15]

O'Donnell further seeks to show that the Act is not narrowly tailored by claiming that in its application, even a higher percentage of certain types of contracts are advertised on the sheltered market than the established 35% goal. Specifically, according to O'Donnell over 90% of all locally funded *road construction* contracts have

---

**14.** *See Cone Corp. v. Hillsborough County*, 908 F.2d 908, 916 (11th Cir.), *cert. denied*, — U.S. ——, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990) ("The *Croson* Court listed a 'whole array of race-neutral devices to increase the accessibility of city contracting opportunities to small entrepreneurs of all races,' ... including simplified bidding procedures, relaxed bonding requirements, and training and financial aid. While the *Croson* Court referred to these measures as alternatives to MBE plans, inclusion of such measures in an MBE plan would lend to the Plan's flexibility.")

**15.** When considering whether the Richmond plan was remedial in nature, the Supreme Court

found it to be grossly overinclusive because the statute's inclusion of various racial and ethnic minorities was not justified by any evidence of past discrimination. *Croson*, 109 S.Ct. at 727–728. In the instant case, the record shows that the statistics relied upon by the Committee refer generally to "minority" participation in contracting and "minority" contracting capability. They do not provide a statistical analysis for each racial and ethnic group benefitted by the MBE plan. As a consequence, the District's MBE program may also suffer from overinclusiveness.

been placed in the sheltered market during fiscal years 1987 through 1990.[16] *See* Fifth Affidavit of Arnold J. O'Donnell, dated January 29, 1991. O'Donnell contends that it would have bid for many of these road construction contracts had they not been reserved exclusively for MBE firms, because they were smaller projects worth less than two million dollars. *Id.* at para. 3. In sum, O'Donnell argues that the District's administration of the Act has placed an intolerable burden on innocent non-minority road construction firms.

The percentages presented by O'Donnell only concern road construction contracts. For this reason, the Court does not find them to have conclusive probative value. As the Court stated previously, *Croson* does not require states and localities to divide the construction industry into distinct lines of business and create individual MBE programs for each subcategory of the industry. Likewise, the mere fact that a larger percentage of road construction contracts, as opposed to building construction contracts, are placed in the sheltered market does not in itself suggest that a constitutional violation exists. Notwithstanding the foregoing, the percentages quoted by O'Donnell concerning locally funded road construction work demonstrate that the MBE program may indeed be flawed. In the Court's view, the Districts's practice of setting aside over 90% of such contracts, if true, cannot be easily dismissed. O'Donnell has raised a substantial question regarding whether the administration of the MBE program imposes an undue burden on non-minorities. *See Metro Broadcasting, Inc. v. F.C.C,* — U.S. —, 110 S.Ct. 2997, 3027, 111 L.Ed.2d 445 (1990); *Fullilove,* 448 U.S. at 484, 100 S.Ct. at 2777. However, since there is disagreement between the parties as to the underlying facts supporting O'Donnell's claims, the Court is hesitant to resolve this issue without further submissions. Moreover, none of the parties has provided the Court with figures representing contract awards for the *entire* MBE program. Accordingly, the

Court is not able to conclude for the purposes of this motion whether the District's application of the Act is not narrowly tailored and violates the constitution.

In sum, comparison of the District's Act with the Richmond plan demonstrates that the two are vastly different in critical areas. It appears that the District has a strong basis in evidence for its conclusion that remedial action was necessary. The statistical disparities uncovered by the Committee, combined with the testimony regarding discrimination in the construction industry, provides ample evidence on the question of prior discrimination and the need for race-conscious remedial relief. Further, the 35% set-aside figure is not an arbitrary figure unrelated to past discrimination, unlike the 30% figure utilized by Richmond. Notably, the most troubling aspect of the statute appears to be the District's practice of reserving a very large percentage of road construction contracts for MBEs. The data submitted in this regard, however, is inconclusive. For these reasons, it is unlikely that O'Donnell can show that the Act falls short of the standard adopted by the Court in *Croson.* Thus, the Court concludes that O'Donnell has not demonstrated at this juncture that it is likely to prevail on the merits with respect to its challenge to the District's MBE plan.

### 2. Disadvantaged Business Enterprise Program

■ The Court must also determine whether O'Donnell is likely to succeed on its claim that the federally funded Disadvantaged Business Enterprise Program administered by the District is unconstitutional. The Supreme Court has recently held that "benign race conscious measures mandated by Congress ... are constitutionally permissible to the extent that they serve important governmental objectives within the powers of Congress and are substantially related to the achievement of those objectives." *Metro Broadcasting,* 110 S.Ct. at 3008–3009. Thus, the Court will

---

**16.** Defendants contend there are serious flaws in the calculations set forth in the Fifth Affidavit of Arnold J. O'Donnell and the supporting data submitted with the affidavit. *See* Affidavit of Jerry M. Carter, dated February 7, 1991.

evaluate the DBE program under this standard of review.

■ With respect to the DBE Program, O'Donnell does not challenge the federal statute, its implementing regulations, or the District's decision to apply for these highway construction funds. Instead, O'Donnell argues that the set-aside program, as implemented by the District, is not narrowly tailored. Specifically, O'Donnell contends that the District's DBE program, on its face and in practice, far exceeds the race-conscious remedial relief mandated by Congress under STURAA in the form of a 10% set-aside for disadvantaged business enterprises. O'Donnell asserts that there is no independent basis—i.e. evidence of past discrimination—to justify the significantly higher 37% figure established by the DBE program.

O'Donnell's argument is similar to those raised by the plaintiffs in *Milwaukee County Pavers Ass'n v. Fiedler*, 731 F.Supp. 1395 (W.D.Wis.1990), *aff'd*, 922 F.2d 419 (7th Cir.1991). *Milwaukee County Pavers* also involved a constitutional challenge to a state DBE program implemented pursuant to STURAA. The Wisconsin DBE program established a set-aside goal of not less than 10%, and in practice the actual expenditure amounted to 13.1% to 15.7% in various years. As in the instant case, plaintiffs therein conceded the constitutionality of the federal act but argued that Wisconsin's implementation of the program was unconstitutional. First, they argued that the program was not narrowly tailored because the state had not made findings of past discrimination in Wisconsin. Second, they argued that the state's administration of its DBE program exceeded its authority under STURAA.

The district court rejected plaintiffs' initial argument, and held that it would be inconsistent with *Fullilove* to require states to make findings of prior discrimination to ensure that their implementation of the federal statute is narrowly tailored. *Id.* at 1409–10. The Seventh Circuit af-

firmed this ruling, and further explained that under the authority of the Fourteenth Amendment, Congress can "engage in affirmative action with a freer hand than states and municipalities. And one way it can do that is by authorizing states to do things that they could not do without federal authorization. That was *Fullilove;* it is this case as well." 922 F.2d at 424.

The *Milwaukee County Pavers* district court also found Wisconsin's use of the program to be outside the bounds of federal authority in three aspects and thus unconstitutional in those areas, namely: "(1) in setting goals for disadvantaged business subcontractor participation in projects funded exclusively by the state, (2) in requiring disadvantaged business prime contractors to make good faith efforts to use disadvantaged business subcontractors, and (3) in extending the Wisconsin program past the date for which the [federal] program is authorized." 731 F.Supp. at 1399. In so holding, the district court stated: "The constitutionality of the state's program depends on its character as an implementation of the federal program. To the extent that the state steps beyond the boundaries of this federal authority, it is acting on its own authority and must base its action on specific findings of identifiable discrimination." *Id.* at 1414.

This Court agrees that the District's program would be vulnerable to challenge if it exceeded its federal authority under STURAA. This principle is not inconsistent with *Fullilove*. Although the federal statute at issue in *Fullilove* was held to be constitutional on its face, the Supreme Court noted that "questions of specific application must await future cases." *Fullilove*, 448 U.S. at 486, 100 S.Ct. at 2779. The question to be decided in this case is whether the District's set-aside goal of 37% exceeds its authority under the federal statute and, if so, whether this goal is supported by specific findings of identifiable discrimination such that the program is nevertheless narrowly tailored.[17]

---

17. The District has unconvincingly argued that the DBE program is not race-based because the classification is defined as "disadvantaged" rath-

er than "minority." While DBEs do not necessarily have to be minority owned, the regulations provide various racial and ethnic groups

Under STURAA, recipients of federal funds must set an overall goal of ten percent or more for participation by DBEs. Where a state seeks to impose an overall goal of less than 10%, the regulations specifically set forth the necessary information which must be supplied to justify such a request. *See* 49 C.F.R. section 23.65. The regulations also clearly contemplate that recipients may set a goal larger than the 10% minimum, so long as the figure is "practical and related to the availability of DBEs in desired areas of expertise." 49 C.F.R. section 23.45(g). The Court, however, need not resolve at this time whether the 37% figure is outside the bounds of federal authority under STURAA since it appears that the legislative findings of discrimination in the local construction industry which were analyzed in connection with the Minority Contracting Act may also justify a 37% set-aside goal for federally funded construction projects.

As with the MBE program, Croson here argues that the DBE program is not narrowly tailored as applied. O'Donnell contends that since 1987 approximately 49% of all federally funded road construction contracts have been reserved for DBEs. *See* Fifth Affidavit of Arnold J. O'Donnell, dated January 29, 1991. For the reasons discussed in connection with the MBE program, the Court believes that a substantial question has been raised regarding whether in practice the DBE program unduly burdens non-minorities; however, further inquiries must be made by this Court before a determination can be made whether the DBE program is sufficiently narrowly tailored.

For the foregoing reasons, the Court concludes that O'Donnell has not demonstrated that it is likely to prevail on the merits of its claim that the DBE program is an unconstitutional violation of the equal protection clause.

with a presumption of social and economic disadvantage. Anyone who is not a member of these groups must prove that s/he is actually socially and economically disadvantaged. In *Milwaukee County Pavers,* the Seventh Circuit

## D. *Irreparable Injury, Harm to Other Parties & the Public Interest*

■ Having concluded that O'Donnell has not demonstrated that it is likely to prevail on the merits of its claims that the District's MBE and DBE programs are unconstitutional, the Court must now turn to the other three *Holiday Tours* factors to determine whether injunctive relief is warranted.

First, the irreparable injury issue does not weigh in favor of granting a preliminary injunction. O'Donnell alleges two types of irreparable injury. He asserts that the alleged violation of constitutional equal protection rights constitutes irreparable harm. This argument must be rejected in view of the fact that O'Donnell has not persuaded the Court that it is likely to succeed on its claim of constitutional violations. O'Donnell also contends that if the set-aside programs continue to operate during the pendency of this suit, it would be difficult to prove money damages. The Court must reject this argument as well. "Conjecture about a possibility of difficulties with damage computations is inadequate to support an injunction before trial. Because plaintiff presented no evidence on the issue, we cannot agree that irreparable injury is 'apparent'. In addition, that difficult damage calculations 'may' occur is not enough." *Northeastern Florida Chapter of Ass'n of General Contractors v. City of Jacksonville, Fla.,* 896 F.2d 1283, 1286 (11th Cir.1990) (reversing issuance of injunction prohibiting enforcement of minority set-aside ordinance on grounds that plaintiff had not made showing of irreparable injury) (*citing Sampson v. Murray,* 415 U.S. 61, 88–89, 94 S.Ct. 937, 951–52, 39 L.Ed.2d 166 (1974)).

■ Second, it does not appear that the balance of hardships tips sharply in O'Donnell's favor. At most, O'Donnell would suffer lost profits if there were a wrongful denial of a preliminary injunction. The harms that others will incur is primarily

held that for the purposes of equal protection analysis the racial presumption in STURAA is in itself a form of racial discrimination. *See Milwaukee County Pavers,* 922 F.2d at 421–22. This Court agrees.

monetary also. For the District, although an injunction would not halt completion of construction projects, it would result in construction delays and increased administrative costs because of necessary changes in bid specifications. The economic harm to affected MBEs and DBEs is also not minimal.

Finally, the public interest does not favor the granting of injunctive relief. The public has a strong interest in remedying discrimination in the local construction industry. Since the Court has found that O'Donnell does not have a likelihood of succeeding on the merits of its claim that the challenged set-aside programs are unconstitutional, it follows that enjoining the implementation of these programs is not in the public interest.

Accordingly, it is hereby

ORDERED that plaintiff's motion for a preliminary injunction is denied.